Darryl CRAIG, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–87–171 CR.

Court of Appeals of Texas,
Beaumont.

Nov. 3, 1988.

**90**

Jimmy R. Burnitt, Orange, for appellant.

Stephen C. Howard, Orange Co. Atty., Kerry M. Klintworth, First Asst. Co. Atty., Orange, for appellee.

## OPINION

BROOKSHIRE, Justice.

Appellant was indicted for intentionally and knowingly causing the death of Jason Paul Broussard by shooting the deceased with a firearm. The indictment alleged this shooting took place on or about December 29, 1986, in Orange County. Also, the indictment included an enhancement paragraph which alleged that on June 4, 1985, the Appellant had been convicted of a felony, being the burglary of a habitation, and that the said conviction was a final conviction prior to the commission of the shooting of Jason Paul Broussard. By the verdict of the jury the Appellant was convicted of the offense of murder. The punishment was assessed by the jury at life imprisonment adding a $10,000 fine.

The deceased had been gone from his residence for most of the day of December 28, 1986. He came to his residence and apparently was going to retire for the night. He received a telephone call. He got dressed again and announced to his father that he, (Jason Paul) was going to attend a house party. He was driving a blue four-door 1981 Chevrolet Citation. He drove from Port Neches to Beaumont to visit a small group of friends. At least one of the friends had known the deceased during their high school days. The group of friends decided to go to the Copa, a bar located in the downtown area of Beaumont.

Jason Paul drove his Chevrolet Citation to the Copa. He parked his automobile in a parking lot across the street from the bar. The group of friends arrived at the bar somewhere between 11:30 p.m. and 12 o'clock a.m. on December 28, 1986.

Shortly after their arrival at the Copa Club, one of the individuals in the group noticed that the deceased appeared to be interested in a particular person at the bar. The person was described as being a tall, large and muscular male, white, with dark or blondish hair, wearing a red sweater, jeans and boots. This person was identified in the record as the Appellant, Darryl Craig. In certain circles the Copa Club had the reputation of allegedly being a homosexual bar. About three-quarters of an hour past midnight, the Appellant informed one of the performers at the Copa that he (the Appellant), the deceased, and one other unknown male were going to leave the club to smoke some marihuana and would probably return in about a quarter of an hour. They did not return to the bar. The members of the house party looked for the deceased. They could not find him. His Chevrolet Citation was absent from the parking lot.

Fairly early the next morning, December 29, 1986, the Chevrolet Citation was discovered totally burned. The automobile was found on a road near a landfill. The license plate was picked up and identified as the Chevrolet Citation of the deceased. The landfill was near the banks of Cow Bayou between Orange and Vidor. On January 18, 1987, the body of the deceased was found in Cow Bayou. The corpse had been weighted down with bricks.

On the afternoon of January 18, 1987, a forensic pathologist performed an autopsy. This pathologist believed that the deceased had been dead for a period of time from two to three weeks. At the autopsy the examination revealed a shotgun wound in the back of the neck near the base of the skull. The genitals had been mutilated, the skull had been fractured so that the head looked like a "partially deflated football." An examination of the brain revealed foreign objects within the cranial vault, includ-

ing a plastic shotgun wad. A fairly large number of shotgun pellets were located within the cranial vault. The forensic pathologist, Dr. Stanley M. LeBer, determined that the cause of death was a single gunshot wound to the back of the head. The deceased was a healthy individual prior to his tragic death.

At a location on Childers Road, a number of items were found, including a Texas insurance identification card and a gasoline credit card receipt bearing the name of the deceased's father. Several other articles were found. All of these were identified as the property of the deceased. Importantly, there was recovered also at the Childers Road scene, a spent shotgun shell casing.

In mid-February of 1987 certain investigators obtained possession of a shotgun from the residence of the Appellant's family in Orange County. This particular shotgun or firearm was identified by the Appellant's brother as being the property of the brother. This shotgun was kept on the wall in the brother's bedroom at the family residence. A firearm examiner compared the spent shotgun shell casing that was found on Childers Road with the shotgun owned by the Appellant's brother. This firearm examiner came to the conclusion that the shell was fired from this same shotgun, belonging to Appellant's brother.

A witness proffered by the state named John Edward Talbert swore to detailed evidence and testified to a rather complete narrative of the events that happened on the fateful night. Talbert and one Michael Nations borrowed a car. They drove to some place in Mauriceville and picked up the Appellant. The Appellant drove the borrowed car after leaving Mauriceville. The Appellant was identified in the courtroom as being the driver. The three, with the Appellant driving, arrived in Beaumont. They went to a bar known as the Copa. It was located in downtown Beaumont. Talbert observed people that were going into the bar. He noticed that they were homosexuals in his opinion. Some of the males that were going in the bar were dressed like girls and they were acting like girls, according to this witness, Talbert. This

witness refused to go in when Darryl Craig and Michael Nations did go into the Copa. The two announced to Talbert that they were going to meet someone in the bar; but nevertheless, Talbert stayed in the car. He then went to sleep for some period of time in the back seat. Darryl, the Appellant, came to the car and got a tire tool. Darryl left again and Talbert went back to sleep.

At an estimated two hours later apparently Michael Nations got out of another car and Nations had a shotgun in the bag. This shotgun was put in the back seat of the borrowed car.

Talbert testified that he could definitely smell that the gun had been fired. Later, the two cars stopped on a secluded dirt road. Talbert got out of the car. The Appellant approached Talbert and advised him "the best thing I [Talbert] could do was stay in the car and the less I knew about it the better off I'd be...." Talbert stayed in the car. Just prior to that time Talbert testified that Michael Nations was back in a dark area with the other car. Craig was with Nations. At that time Talbert did not know what they were doing.

Then immediately, Craig and Nations ran back to the borrowed car and started driving off. Talbert testified that he identified the shotgun as the property of Darren Craig, who was the brother of Darryl Craig. Talbert testified that he saw Appellant and Nations run back to the borrowed car and Appellant began driving away. The other smaller compact car blew up in flames. There was a bright glare and Talbert looked back and saw that the other car was on fire. The fire was bright and it lighted up the woods area surrounding it.

The Appellant drove the car back to his own residence. He recovered the bag and the shotgun and then he left to enter his house. Then Nations drove Talbert to Talbert's place of residence. Talbert arrived there at approximately 4:00 a.m. or some early morning hour on December 29, 1986.

A witness named Biancardi was called by the state. He was a resident of Austin, Texas. He described himself as a close boyfriend of the Appellant. He pointed out

the Appellant in the courtroom and identified him. Beginning on January 21st of 1987, Darryl Craig started living with Biancardi at the Austin apartment of Biancardi. The Appellant resided there until arrested by the authorities. The arrest took place sometime in the extreme latter part of January or sometime in early February, 1987.

A dramatic conversation took place between the two. It was testified that the conversation took place between 5:00 o'clock and 7:00 o'clock p.m. on January 30, 1987. The witness, Biancardi, was asked this question: "What did Darryl Craig tell you?" He informed me that he, Craig, had: "wasted someone over in Orange; that he used a shotgun and that he had shot the guy point blank in the back of the head."

The next answer was: "Yes, sir, while he was talking—you know, he was more or less bragging about it—he, you know, said he wasted the guy by shooting him in the back of the head, and he pointed to the back of his own head." The record shows that according to Biancardi, Darryl Craig and Darryl's friend, according to Darryl's statement, had gone to a nightclub in Beaumont called the Copa. Darryl admitted that he was broke and he planned to rip somebody off and that he observed a person flashing money. They invited this person outside.

According to Biancardi, Darryl Craig stated that he had struck the person that he had invited out of the bar to smoke a joint of marihuana. After he struck him, the witness, Biancardi was asked this question:

"Q   What did he tell you?

"A   He blew him away, point blank, with the shotgun, in the back of the head."

Then, this same witness testified in substance that Darryl Craig said that "they" tied the kid up with wire. The word "they" referred to Darryl and his friend that went with him, initially, into the Copa Bar. Then "they" bound the young man's legs, using wire and bricks. Then "they" threw the body of the young man into Cow Bayou.

Then the record contains this colloquy:

"Q   Did Darryl indicate to you whether or not he was disappointed in his own behavior about how he acted that night?

"A   Yes, sir.

"Q   What did Darryl Craig tell you?

"A   He regreted [sic] not either blowing a hole in the guy's stomach, or cutting him there, so the body wouldn't be buoyant, and that it had been found, because he already knew the body had been found by the police."

During the same conversation, according to Biancardi, Darryl Craig admitted that the victim's car was stripped, the stereo being taken out and the speakers being removed. Then the victim's car was set aflame. It was completely torched. Also, in the same conversation, the Appellant had told Biancardi that he had an alibi and that the alibi would be that he was to have been at a neighbor's house watching a movie on the night of the crime.

■ The Appellant advances 3 points of error. The first point is that the trial court erred in allowing Officer Franklin of the Orange County Sheriff's Office to testify about the crime statistics of Orange County concerning and dealing with the findings of bodies and burnt cars or automobiles.

The officer was identified as Captain Larry Franklin, who was the chief of the criminal investigation division of the Sheriff's Department. He testified on behalf of the State. He testified that he had personal knowledge of all serious crimes and offenses that had occurred in Orange County and that were reported to, and investigated by, the Sheriff's Department. The captain swore that, of his personal knowledge, only one body was recovered from Cow Bayou that was bound with wire and brick and that only one car was found burned by the landfill during the last several weeks of December of 1986 and the first several weeks of January of 1987. The court permitted this testimony to come into the record before the jury over the hearsay objection made by defense counsel. We decide that the testimony was admissible and had probative force and value to establish the venue of this offense within Or-

ange County, Texas. Likewise, this testimony had probative value and force in the process of identifying the deceased person as well as the identity of the car which had been driven by the deceased. This testimony concerned circumstances which made the commission of the murder offense by the Appellant more probable. We think Captain Franklin's testimony was relevant and material. In *Stewart v. State*, 138 Tex.Cr.R. 286, 135 S.W.2d 103 (1939), the court, by and through a Commissioners' decision, determined that relevancy is defined as that which conduces to the proof of a pertinent hypothesis; that is, a pertinent hypothesis being one which, if sustained, would logically influence the issue or the outcome of the proceeding. Hence, the Commission wrote, 135 S.W.2d at page 104:

> " '[I]t is relevant to put in evidence any circumstance which tends to make the proposition at issue either more or less probable.' "

The opinion of the Commission of Appeals was approved by the Court of Criminal Appeals. *See* 2 C. McCORMICK & R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL Sec. 1481, (Texas Practice 2d ed. 1956); 2 R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL Sec. 1481, (Texas Practice 3rd ed. 1980). Point of Error Number One is overruled.

The second point of error argues that that the trial judge erred in not granting a mistrial after a person was brought into the courtroom in handcuffs, leg irons and jail clothes.

While the State was presenting its case in chief, a female witness was called to the stand to establish certain events that had transpired at the Copa Club—a gay bar in downtown Beaumont. These events were testified to as having occurred immediately prior to the abduction and killing of the deceased. The female witness testified that she observed that the deceased became interested in one man who was wearing a red sweater, boots and jeans, which the female witness definitely identified as the Appellant. Then this same witness observed that the Appellant had been accom-

panied by a taller man with long, dark or black hair. This same witness further saw the deceased having a conversation with these two men. Then, this witness went to a different part of the bar. She never saw the deceased again, although she had searched the bar and the parking lot looking for the deceased. This female witness was cross-examined by the defense counsel. Then the State, through its prosecutor, brought a male person into the courtroom and asked the female witness, known as "Lee Ann", if she recognized the person. The witness responded that she could not either recognize or identify this individual. The defense counsel made a motion for mistrial, stating, in substance, that the presenting of this person in khaki jail overalls, with leg irons on, showing him to the jury in the presence of the Appellant was error. The defense asked for a mistrial because:

> "[T]his is prejudicial, biased, and is intended to inflame the minds of the jury and further is a denial of the defendant's constitutional rights. By exposing him [the defendant] to the witness you also attempted to be identified in the presence of the jury dressed in those manners...."

The record does not reflect that the white male was ever identified or recognized as Michael Nations or anyone else and the State takes the position that the record does not show how this white male was actually attired and that the defense counsel's motion, itself, would not constitute evidence and testimony.

■ A major thrust of the Appellant's counsel is that error exists because the Appellant's right to the presumption of innocence was infringed upon. In *Thompson v. State*, 514 S.W.2d 275 (Tex.Crim. App.1974), speaks to this point. In *Thompson, supra*, the court reasoned that, to bring a *defendant or accused into the courtroom while he or she is shackled or in jail uniform*, in the presence of a jury, infringes upon the fundamental right to a presumption of innocence, citing *Hernandez v. Beto*, 443 F.2d 634 (5th Cir.1971). However, the same presumption of inno-

cence does not apply to witnesses for the simple reason that the witnesses are not the persons on trial.

But *Thompson, supra,* goes further to hold that it is within the discretion of the trial judge to require that the witnesses be dressed in uniform and be shackled if the circumstances warrant. On appeal, the test is whether or not the trial court abused its discretion in this regard. To properly enable a reviewing court to pass upon the trial court's actions, the record should contain factual matters reflecting the criteria upon which the trial court's discretion was exercised. Also, the record should reflect, as well, that the trial court had fair knowledge and understanding of such factual matters and surrounding circumstances. The Appellant and the record failed to show reversible error or any error. The record shows no abuse of discretion on the part of the district judge.

In *Groh v. State,* 725 S.W.2d 282 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd), the opinion of the court recited that no Texas court had found reversible error wherein a witness for the defense was presented to the jury in jail clothes. Under our record, this male person was not identified and was not presented to the jury as a witness. Some male person simply appeared in the courtroom. This person was not placed in the witness box. This male person did not testify. In *Groh, supra,* the court distinguished cases in which a conviction was reversed because the defendant, himself, was forced to testify in handcuffs in those cases where a non-party witness (other than the accused) was forced to testify in handcuffs or restraints. *See Moore v. State,* 535 S.W.2d 357 (Tex.Crim.App. 1976); *Gammage v. State,* 630 S.W.2d 309 (Tex.App.—San Antonio 1982, pet. ref'd). In *Moore, supra,* and *Gammage, supra,* the courts reasoned that, since the defendants were forced against their will to testify, in handcuffs, reversible error was present for the reason that these restraints, such as handcuffs and leg irons, infringed upon the constitutional presumption of innocence of the accused standing at the bar of justice. Those cases are vastly different and meaningfully distinguishable from the case subjudice.

The current rules of appellate procedure provide that a finding of error requires a reversal "unless the appellate court determines beyond a reasonable doubt that the error made no contribution to the conviction...." *TEX.R.APP.P. 81(b)(2).* Under this entire record, we find that the appearance of this male person in the courtroom, in restraint and in jail attire, made no contribution to the conviction or to the punishment of the Appellant and we so find beyond a reasonable doubt. *TEX.R.APP.P. 81(b)(2).* We overrule Point of Error Number Two.

The third ground of error concerns the trial court's refusal to allow one Thomas Bergeaux to testify about Michael Nations having told to Bergeaux that he, Michael Nations, killed the deceased, Broussard. Bergeaux had known Nations only since about January 2, 1987. Bergeaux testified that on January 3, 1987, being a Saturday night, he had a conversation with Michael Nations. Nations appeared worried but hesitant to talk. Then, Nations told how "they had picked up a fag", and that he, Nations, had killed that individual "fag", and that Nations said he had personally shot the fag and had gotten rid of the fag's body by throwing the body in Cow Bayou.

The testimony of Bergeaux is shown in a bill of exception. This bill of exception invokes a doctrine set forth in *Ramirez v. State,* 543 S.W.2d 631 (Tex.Crim.App.1976). In *Ramirez* a third person confessed that he and another party committed a robbery for which Ramirez was charged. The Court of Criminal Appeals held in the case of *Ramirez* at 632:

"The long established rule in Texas is that declarations of a third party admitting his guilt of the crime for which the accused is on trial are admissible only when the State is relying upon circumstantial evidence, when the guilt of such party is inconsistent with the guilt of the accused, and when the facts show that such party was so situated that he might have committed the crime. *Cameron v.*

*State,* 153 Tex.Cr.R. 29, 217 S.W.2d 23 (1949); *McCormick and Ray,* Texas Laws of Evidence, Sections 1005 and 1006 (2d ed. 1956). See also *Woodard v. State,* 463 S.W.2d 197 (Tex.Cr.App.1971); *Ballew v. State,* 139 Tex.Cr.R. 636, 141 S.W.2d 654 (1940). Appellant recognizes this rule but urges us to reconsider the rule and allow the statement to be admitted. This we decline to do."

In this record there is real and demonstrative evidence. There are numerous photographs depicting real and demonstrative evidence. The testimony of Biancardi narrating the virtual confessions and admissions of Darryl Craig negate the contention that the State is relying upon circumstantial evidence. The sworn testimony of Talbert stating that he saw the Chevrolet Citation explode and burst into flames and further sworn testimony by Talbert that he actually saw the shotgun in question belonging to Darryl's brother impel us to conclude that the proof in this record is not wholly circumstantial or indirect evidence.

2 R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL Sec. 1451 (Texas Practice 3rd ed. 1980) in relevant part reads:

"There are three distinct methods of producing evidence for the purpose of persuading the trier of the facts as to the matters in issue. They are: (1) Direct testimony of witnesses as to the existence of the thing in issue. This may be termed Direct or Testimonial Evidence. (2) Evidence of some other fact not in issue from which may be inferred the existence of the fact in issue. This is Circumstantial or Indirect Evidence. (3) The presentation of the object itself for observation by the court and jury. This is called Demonstrative Evidence."

Considering the entirety of the record and especially the exhibits and photographs, we conclude that Texas is not relying upon circumstantial evidence.

Furthermore, the Appellant fails to meet the test that the guilt of the confessing party must be inconsistent with the guilt of the accused. Indeed, this record glaringly affirms that the guilt of Nations is entirely consistent with the guilt of Darryl Craig. Hence, the Appellant has failed to place himself within the criteria of the *Ramirez* case, *supra,* and of *Cameron v. State,* 153 Tex.Cr.R. 29, 217 S.W.2d 23 (1949). This last and third point of error is overruled. We affirm the sentence and judgment below.

AFFIRMED.