No. 99,549

STATE OF KANSAS, *Appellee*, v. YVONNE WARD, *Appellant*.

(256 P.3d 801)

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 20, 2009. Opinion filed July 29, 2011.

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*Don L. Scott*, county attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Defendant Yvonne Ward appeals her convictions for 14 felonies related to four separate cocaine sales. She argues the trial court erred in denying her motion for mistrial, which she made after witnesses for the prosecution identified two individuals who were sitting in the courtroom and wearing orange jail jumpsuits as people who were with Ward during one or more of the sales, and she challenges the sufficiency of the evidence. A panel of the Court of Appeals affirmed, *State v. Ward*, No. 99,549, 2009 WL 454947 (Kan. App. 2009) (unpublished opinion), and we granted review. Before us, Ward adds a new issue regarding whether the State proved that a school located within 1,000 feet of a laundromat where some of the drug sales occurred was used by a unified school district or an accredited nonpublic school. We decline to address this issue because it was not presented to or considered by the Court of Appeals and was not presented in the petition seeking review of the Court of Appeals' decision. Therefore, the issue was abandoned. Addressing the two issues considered by the Court of Appeals, we affirm the district court and the Court of Appeals, concluding the trial court did not abuse its discretion in denying the motion for mistrial and the evidence was sufficient.

In our discussion of the motion for mistrial, we focus on the standard of review because the parties' arguments and the Court of Appeals' decision reveal potential inconsistencies in our past decisions and resulting confusion regarding the application of Kansas' harmless error statutes, K.S.A. 60-261 and K.S.A. 60-2105, and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), which applies when an error implicates a right guaranteed by the United States Constitution.

## FACTS AND PROCEDURAL BACKGROUND

Ward's 14 felony convictions include two counts of the sale or delivery of cocaine within 1,000 feet of a school (K.S.A. 65-4161[d]; repealed and recodified at K.S.A. 2010 Supp. 21-36a05(a), (c); see L. 2009, ch. 32, secs. 5, 64); two counts of conspiracy to commit the sale or delivery of cocaine within 1,000 feet of a school (K.S.A.

65-4161[d]; K.S.A. 21-3302); two counts of the sale or delivery of cocaine (K.S.A. 65-4161); four counts of possession of cocaine without a drug tax stamp (K.S.A. 79-5204); and four counts of the unlawful use of a communication facility to arrange a drug transaction (K.S.A. 65-4141); repealed and recodified in 2009 at K.S.A. 2010 Supp. 21-36a07.

All of the counts arose when Ward allegedly sold crack cocaine to Candy Stinnett, who agreed to cooperate with Detective Jared Wagenseller of the Seward County Sheriff's Office. Stinnett's cooperation resulted in her buying crack cocaine from Ward during controlled buys that occurred on January 11, January 25, January 31, and February 7, 2007. In exchange for Stinnett's cooperation, the State agreed to dismiss multiple criminal charges that Stinnett faced.

Because Ward argues the evidence was insufficient to support her convictions, a detailed discussion of the evidence is required.

*Trial Evidence*

In describing the first controlled drug buy, Stinnett testified that on January 11, 2007, she was searched, fitted with a wire transmitter, carried documented funds from law enforcement, and went to a telephone booth at a particular laundromat located within 1,000 feet of Garfield School in Liberal, Kansas. She called Ward and "told her that I wanted 120," meaning $120 worth of crack cocaine. Ward responded, "I'm on my way," and Stinnett pulled her car to the side of the building and waited for Ward to arrive. A blue Suburban arrived shortly thereafter. A man later identified as Broderick West was driving, and Ward was sitting in the back seat behind West. Stinnett saw one or two other individuals in the vehicle, one of whom was later identified as Ward's daughter, "Ms. Jackson." Stinnett walked up to the passenger-side window and reached inside, holding the money in her hand. She testified that West took the money and handed it to Ward, who reached between the seats to pick up the crack cocaine. Ward then handed the drugs to Stinnett. Stinnett drove to her meeting location with law enforcement officers and gave the cocaine to Detective Wagenseller. Wagenseller testified that he was parked near the laundromat and

recognized West and Ward. Stinnett subsequently identified Ward and Jackson in a photo lineup.

Stinnett also testified regarding the second controlled drug buy, which took place around January 25, 2007. She met again with law enforcement officers, was searched, was fitted with a wire transmitter, and went to the same laundromat to call Ward. This time Ward told Stinnett to come to Ward's house. After getting permission from officers, Stinnett drove to Ward's house, where she knocked on the door and was invited inside. Stinnett testified that, besides Ward, other people were in the house, including West and Jackson. Stinnett walked up to Ward, told her she "needed 80," and gave Ward $80. Ward then handed Stinnett four rocks of crack cocaine. Afterward, Stinnett returned to the designated meeting location and turned over the drugs to Detective Wagenseller.

As for the controlled drug buy on January 31, 2007, Stinnett gave similar testimony about the search process, being fitted for a wire transmitter, accepting $100 from law enforcement officers for purchasing drugs, going to the laundromat, and calling Ward to tell her she "needed 100." Again, Ward told Stinnett to come to her house. As before, while officers waited in the vicinity of Ward's house, Stinnett was invited inside. Stinnett testified that she heard Ward tell someone to "[l]et her in." Stinnett walked up to Ward, who was sitting on the living room sofa, and gave her the $100. In return, Ward gave Stinnett five rocks of crack cocaine. Stinnett then met with officers and gave the drugs to Detective Wagenseller.

The last drug transaction between Stinnett and Ward occurred on February 7, 2007. Stinnett testified that, wearing a wire transmitter and carrying $80 provided by officers, she called Ward from the laundromat. This time Ward told Stinnett, "I'm on my way," and met her around the side of the building. Ward, again, arrived in the blue Suburban. West was driving, and Ward sat in the passenger seat. Stinnett approached the passenger-side window. Stinnett described a "rock" sitting on the center console, off of which Ward cut four rocks of crack cocaine with a razor blade. Ward handed the four rocks to Stinnett. When the Suburban left, Detective Wagenseller recognized the occupants as West and Ward.

He followed the Suburban to Ward's residence before returning to the designated meeting place, where he met Stinnett who handed over the drugs.

After these controlled drug buys, Ward was arrested. The events surrounding the arrest and investigation were detailed at trial by several law enforcement officers. Detective Wagenseller's trial testimony gave rise to the motion for mistrial that is the focus of an issue on appeal. The motion was made by defense counsel after Detective Wagenseller identified Ward's associates, West and Jackson, by pointing them out while they sat in the courtroom. Both individuals were dressed in orange jail jumpsuits.

Detective Wagenseller identified West while explaining that Ward had been a passenger in a blue Suburban during the January 11, 2007, sale. When the detective was asked who was driving, the detective indicated it was West. The prosecutor then asked, "And is Mr. West in the courtroom today?" Wagenseller responded affirmatively and, when asked to point to West, stated, "He's sitting in the back of the courtroom, wearing oranges."

Later in Detective Wagenseller's testimony he identified Jackson, who was also dressed in an orange jumpsuit. This identification occurred when the prosecutor asked Detective Wagenseller to explain a photo lineup he used to confirm Stinnett's identification of Ward. The detective responded that he gave Stinnett a photo lineup of six unnamed females and asked Stinnett to identify Ward. Stinnett marked two photos, identifying one as Ward and the other as Jackson. The prosecutor's next question was whether Jackson was in the courtroom; Wagenseller answered that she was and that she was "seated in the first row, the second individual wearing oranges, the smaller female." (There were three individuals wearing jail clothing, but only two of them were identified by witnesses during the State's case-in-chief.)

Both of these identifications occurred without immediate objection. A short time later, defense counsel objected outside the presence of the jury and asked for a mistrial, arguing that West and Jackson were not listed as witnesses and allowing them to remain in the courtroom in jail clothing after being associated with Ward would prejudice Ward. In response, the prosecutor explained that

he wanted to show that Stinnett knew the individuals she was identifying, that West was identified as an alleged coconspirator in the case, and that the State was trying to preclude Ward from claiming that "some other dude did it." The trial court denied the motion for mistrial, without making any finding or conclusion other than mentioning there was no evidence of prejudice.

In addition, the trial court allowed West and Jackson to remain in the courtroom, which led to another identification of West as an associate of Ward. This subsequent identification occurred when Stinnett identified West as the Suburban's driver during the January 11, 2007, sale; she pointed out that he was "in the orange suit sitting next to the gentleman in the gray shirt." Then, after she testified he also drove the Suburban on February 7, 2007, the prosecutor asked her to confirm that West was in the courtroom. She referred to West as "the only gentleman in the orange, sitting in the back of the courtroom."

Based on this evidence and some additional evidence we will discuss as necessary, the jury convicted Ward on the multiple counts related to these cocaine sales.

*Court of Appeals' Decision*

Ward appealed to the Court of Appeals and argued the trial court erred in denying her motion for mistrial and the State's evidence was insufficient to support the jury's verdict.

Regarding Ward's assertion that the trial court erred in failing to grant her motion for mistrial, the Court of Appeals, after finding no guidance on the issue of whether witnesses for the prosecution may identify individuals as associates of the defendant while those individuals are dressed in jail clothing and seated in the courtroom, stated:

"It seems elemental that to avoid potential prejudice, the State should be discouraged from needlessly associating defendants with individuals whose attire identifies them as inmates. Here, however, the district court accepted the State's argument that the identification of West and Jackson served legitimate purposes. The district court has a distinct advantage over this court in determining whether actions in the courtroom are sufficiently prejudicial to warrant a mistrial. See K.S.A. 22-3423." *Ward,* 2009 WL 454947, at *5.

Additionally, the Court of Appeals held that even if it were to conclude that the trial court abused its discretion in denying Ward's motion for mistrial, Ward failed to establish that her substantial rights were prejudiced by the error. Because of the substantial evidence supporting Ward's convictions, the panel concluded that the witnesses' identifications of West and Jackson as associates of Ward had little, if any, likelihood of changing the outcome of the trial. *Ward*, 2009 WL 454947, at *5.

Regarding the sufficiency of evidence issue, Ward made general assertions that (a) the only evidence linking Ward to the crimes was Stinnett's testimony and that testimony lacked credibility and (b) the State failed to present audio, video, forensic, or other direct evidence connecting Ward to the crimes.

In rejecting these arguments, the Court of Appeals panel pointed out that the jury was made aware of Stinnett's cooperation with law enforcement in exchange for the dismissal of charges against her, some of which were drug related, and Ward was asking the court to reweigh credibility. *Ward*, 2009 WL 454947, at *1. The court also noted there was more than sufficient evidence, both direct and circumstantial, from which "a reasonable jury could infer that Ward was connected to the drug transactions." *Ward*, 2009 WL 454947, at *2.

Having rejected both of Ward's arguments, the Court of Appeals affirmed. Ward filed a petition for review, which this court granted. Our jurisdiction arises from K.S.A. 20-3018(b) and K.S.A. 22-3602(e).

## I. MOTION FOR MISTRIAL

We will first consider Ward's argument that the trial court erred in denying her motion for mistrial in which she alleged that allowing Detective Wagenseller to identify West and Jackson while they were sitting in the courtroom wearing orange jail jumpsuits was "highly prejudicial." Ward did not renew this objection later in the trial when Stinnett made another identification of West and did not renew her motion for mistrial at that time or at the conclusion of all of the evidence. Hence, the trial court considered this mistrial issue mid-trial.

On appeal, Ward argues that the presence of her associates in distinctive jail clothing prejudiced her rights to a fair trial and to a presumption of innocence as guaranteed by both the United States Constitution and the Kansas Constitution. The State responds that Ward "made no showing of prejudice and it was not an abuse of discretion to deny the defendant's motion for mistrial."

## A. *Legal Principles/General Standard of Review*

K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial because of "prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution." Applying this statute, a trial court must engage in a two-step analysis. First, the trial court must decide if " 'there is some fundamental failure of the proceeding.' " *State v. White*, 284 Kan. 333, 343, 161 P.3d 208 (2007) (quoting *State v. Lewis*, 238 Kan. 94, 97, 708 P.2d 196 [1985]). If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an "injustice." This means, as we explained in *White*, that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by an admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial. *White*, 284 Kan. at 343.

On appeal, the trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard. *State v. Leaper*, 291 Kan. 89, 96-97, 238 P.3d 266 (2010); *State v. Foster*, 290 Kan. 696, 718, 233 P.3d 265 (2010). Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010). In some cases, this three-part standard may narrow the broad discretion previously allowed when this court routinely applied only the no-reasonable-person-would-take-the-

same-view standard. See, *e.g.*, *State v. Ransom*, 288 Kan. 697, 715, 207 P.3d 208 (2009) (mistrial abuse of discretion standard "does not change even if legal error prompted consideration of a mistrial"; applying standard of whether any reasonable person would take the same view).

Applying the abuse of discretion standard of review, an appellate court focuses on the two questions analyzed by the trial court and asks: (1) Did the trial court abuse its discretion when deciding if there was a fundamental failure in the proceeding? and (2) Did the trial court abuse its discretion when deciding whether the conduct resulted in prejudice that could not be cured or mitigated through jury admonition or instruction, resulting in an injustice?

The rubric for analysis of the first question varies with the nature of the alleged misconduct, such as whether the allegation is based on the actions of a witness, the actions of a bystander, prosecutorial misconduct, or evidentiary error. See *Leaper*, 291 Kan. at 96-104 (conduct of witness in allegedly stealing an offered exhibit from witness stand); *Foster*, 290 Kan. at 718-21 (conduct of bystander in crying during victim's testimony); *White*, 284 Kan. at 340-44 (prosecutorial misconduct in the form of inappropriate questioning and argument); *State v. Tatum*, 281 Kan. 1098, 1110, 135 P.3d 1088 (2006) (evidentiary error in admitting K.S.A. 60-455 evidence).

As to the second inquiry of whether the conduct "makes it impossible to proceed with the trial without injustice," an appellate court's vantage point may be broader than was that of the trial court. An appellate court will examine the entire record whereas, depending on the timing of the motion for mistrial, the trial court may have made the assessment before the trial's end. See generally *Leaper*, 291 Kan. at 96-97; *White*, 284 Kan. at 343-44; see also K.S.A. 60-2105 (appellate harmless error statute, stating prejudice caused by error is assessed "upon the whole record"). Regarding the test against which the record is examined, the parties cite to cases that state the standard in three different ways. While at first glance it appears three different standards were applied in the various cases, we ultimately conclude that one standard has been ap-

plied, but that standard has been expressed in different ways. Some discussion of the cited cases is necessary to explain this conclusion.

### 1. *The State's Standard: Was the Outcome Affected?*

The State cites *State v. Rinck*, 256 Kan. 848, 888 P.2d 845 (1995). In that case, this court concluded the trial court did not abuse its discretion in denying a motion for mistrial because the alleged misconduct—a witness' statement that he ran into the defendant after the defendant had been released from prison—"could not have affected the result at trial." *Rinck*, 256 Kan. at 854. Similar language has been used in recent decisions. For example, in *State v. Dixon*, 289 Kan. 46, 55, 209 P.3d 675 (2009), we indicated that an appellate court "should consider whether a limiting instruction was given, the degree of prejudice, and whether any evidence improperly admitted *would affect the outcome of the trial*." (Emphasis added.)

Neither of these cases explains the origin of the "would affect the outcome of the trial" standard. Rather both cite to prior cases that, in turn, cite to prior cases. Tracking this judicial lineage eventually leads to previous versions of K.S.A. 60-261 as the source of the standard. (*Rinck*, 256 Kan. at 853, cites to *State v. Mitchell*, 220 Kan. 700, 703, 556 P.2d 874 [1976], and *Dixon*, 289 Kan. at 55, cites to *State v. Sanders*, 263 Kan. 317, 324, 949 P.2d 1084 [1997], which in turn cites to *Mitchell. Mitchell* cites to *State v. Bly*, 215 Kan. 168, 178, 523 P.2d 397 [1974], *overruled on other grounds by State v. Mims*, 220 Kan. 726, 556 P.2d 387 [1976], *disapproved on other grounds by State v. Gunby*, 282 Kan. 39, 144 P.3d 647 [2006]. In *Bly*, 215 Kan. at 178, the court cites to the statutory source, K.S.A. 60-261. The 2010 amendments to K.S.A. 60-261 did not change the substance of the statute that was in effect in *Bly* or at the time of Ward's trial; the amendments are stylistic only. See K.S.A. 2010 Supp. 60-261; Judicial Council Civil Code Advisory Committee, Report to Judicial Council regarding Proposed Amendments to the Kansas Code of Civil Procedure, Comments to K.S.A. 60-261, p. 159 [December 4, 2009]).

### 2. *The Court of Appeals' Standard: Were Substantial Rights Affected?*

By an equally circuitous route, we conclude the standard stated by the Court of Appeals also derives from K.S.A. 60-261. Yet, the wording of the standard was different; the Court of Appeals stated that Ward "failed to establish that her substantial rights were prejudiced by the error." *State v. Ward*, No. 99,549, 2009 WL 454947, at *5 (Kan. App. 2009) (unpublished opinion) (citing *State v. Albright*, 283 Kan. 418, 425-26, 153 P.3d 497 [2007]). This wording has been used by this court in several recent decisions, including *Leaper*, 291 Kan. at 96-97, and *State v. Angelo*, 287 Kan. 262, 283-85, 197 P.3d 337 (2008).

Although *Leaper, Angelo, Ward,* and many other cases using this language do not cite to K.S.A. 2010 Supp. 60-261, the "substantial rights" wording echoes the language of that provision, which currently states:

"Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. *At every stage of the proceeding,* the court must disregard all errors and defects that do not affect *any party's substantial rights.*" (Emphasis added.) K.S.A. 2010 Supp. 60-261.

### 3. *The Link Between the Standards*

The text of K.S.A. 60-261 explains the source of the "substantial rights" language. Yet, the statute does not specify a test for determining whether a party's substantial rights are affected. Despite the lack of statutory language, we have frequently stated that the test is whether the error affected the outcome of the trial. This test is widely accepted and has been used by the United States Supreme Court for more than a half-century and by this court for a century. *E.g., Kotteakos v. United States*, 328 U.S. 750, 764-65, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946); *Bly*, 215 Kan. at 178; *Smith v. Union Pacific Railroad Co.*, 214 Kan. 128, 132, 519 P.2d 1101 (1974); *Saunders v. Railway Co.*, 86 Kan. 56, 62, 119 P. 552 (1911); see generally 2 Childress & Davis, Federal Standards of Review § 7.03 (4th ed. 2010).

At the federal level, the phrase "affect the substantial rights" was codified in 1919 at 28 U.S.C. § 391, which provided that appellate courts should decide cases based on the entire record of the case "without regard to technical errors, defects, or exceptions" that do not "affect the substantial rights of the parties." See *Kotteakos*, 328 U.S. at 757. In *Kotteakos*, the United States Supreme Court noted that the phrase "affect the substantial rights" also had been incorporated in the harmless error rule, Rule 52(a) of the Federal Rules of Criminal Procedure, which the Court characterized as a "restatement of existing law." *Kotteakos*, 328 U.S. at 757 n.9. The Court then concluded that an error "affected the defendant's substantial rights" if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos*, 328 U.S. at 776.

Since *Kotteakos*, the United States Supreme Court has consistently reiterated that an error affected substantial rights when it had a prejudicial effect on the outcome of the proceeding. See *United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004) (the phrase " 'error that affects substantial rights' " means "error with a prejudicial affect on the outcome of a judicial proceeding"); *United States v. Olano*, 507 U.S. 725, 734, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993) (The plain error rule of Fed. R. Crim. Proc. 52[b] requires showing that the error affected substantial rights; "[t]his is the same language employed in Rule 52[a], and . . . means that the error must have been prejudicial: It must have affected the outcome of the . . . proceedings."); *United States v. Lane*, 474 U.S. 438, 449, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986) (quoting *Kotteakos*, 328 U.S. at 776 and concluding that error involving misjoinder affected substantial rights requiring reversal "only if the misjoinder results in actual prejudice because it 'had a substantial and injurious effect or influence in determining the jury's verdict' ").

A similar history can be traced in Kansas cases. In 1911, this court discussed the version of K.S.A. 60-261 that was then in effect. The statute required the court to ignore "technical errors" and defined a reversible error as one that "prejudicially affected the substantial rights of the party complaining." G.S. 1909, 95-6176 (Civ. Code § 581). The court explained that a court must

"disregard immaterial errors and rulings that do not appear to have influenced the verdict or impaired substantial rights. The ruling must be prejudicial as well as erroneous, and prejudice must affirmatively appear, or the error will be disregarded. Prejudice may be said to appear when the proceedings show that the court or jury was misled by the error, and that the verdict or judgment was probably affected to the injury of the complaining party." *Saunders*, 86 Kan. at 62.

When the various statutory amendments that result in the current version of the harmless error statute, K.S.A. 2010 Supp. 60-261, are traced through this court's case law, similar statements can be found in many cases. This history and the use of the "would affect the outcome of the trial" standard when examining if substantial rights were affected leads us to the conclusion that the Court of Appeals in this case was applying 60-261. This conclusion is reaffirmed if we follow the judicial lineage of the cases cited by the Court of Appeals; the line eventually ends with 60-261.

In addition to citing to K.S.A. 60-261, many of this court's cases also cite the appellate harmless error statute, K.S.A. 60-2105, as the standard for an appellate court's review of the trial court's application of K.S.A. 60-261. See, *e.g., State v. Rider, Edens & Lemons*, 229 Kan. 394, 407, 625 P.2d 425 (1981); *cf. Thompson v. General Finance Co, Inc*, 205 Kan. 76, 101, 468 P.2d 269 (1970) (noting that there had been no motion for mistrial or showing of a basis for mistrial under K.S.A. 60-261 and K.S.A. 60-2105). The appellate harmless error statute, K.S.A. 60-2105, also uses the "substantial rights" standard, providing:

"The appellate court shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the *substantial rights* of the party complaining, where it appears upon the *whole record* that *substantial justice* has been done by the judgment or order of the trial court; and in any case pending before it, the court shall render such final judgment as it deems that justice requires, or direct such judgment to be rendered by the court from which the appeal was taken, without regard to technical errors and irregularities in the proceedings of the trial court." (Emphasis added.)

Even if we did not have numerous cases relying on K.S.A. 60-261 and K.S.A. 60-2105 when assessing if a mistrial should be granted, the text of those provisions would lead us to conclude the statutes should be applied because the language clearly fits the task of evaluating a mistrial motion. For example, applying the statutory

"substantial rights" standard to determine what "justice requires" under 60-261 is congruent with a trial court's assessment of whether there was an "injustice," as that term is used in K.S.A. 22-3423(1)(c), the criminal mistrial statute. Furthermore, applying 60-261 at the stage of the trial when a motion for mistrial is made is compatible with the plain language of 60-261 indicating the standard should be applied at "every stage of the proceeding." K.S.A. 60-2105 can then be applied by an appellate court reviewing a trial court ruling.

4. *Ward's Federal Constitutional Harmless Error Standard: Can We Conclude Beyond a Reasonable Doubt that Substantial Rights Were Not Affected?*

While this discussion reconciles the standards cited by the State and the Court of Appeals and reveals them to be one standard stated in two different ways, Ward cites to a third line of cases. These cases apply the federal constitutional harmless error standard that was first stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967). The United States Supreme Court held that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24. The Court explained that this means that the "beneficiary of [the] constitutional error . . . [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24.

We have frequently applied *Chapman* when reviewing a trial court's decision regarding a motion for mistrial if the underlying error implicated a right guaranteed by the United States Constitution or jointly by the United States Constitution and the Kansas Constitution. See, *e.g., State v. Martinez,* 288 Kan. 443, 450, 204 P.3d 601 (2009); *Saucedo v. Winger,* 252 Kan. 718, 732, 850 P.2d 908 (1993) (standard discussed in context of substantial rights); *cf. Foster,* 290 Kan. at 718-21 (although not citing *Chapman,* finding conduct was not of nature warranting use of constitutional harmless error standard when defendant's father became emotional during trial); *State v. Thompkins,* 271 Kan. 324, 333-34, 21 P.3d 997

(2001) (rejecting application of *Chapman* to mistrial motion based on prosecution's use of defendant's post-*Miranda* statement for impeachment purposes). Unfortunately, in some of the cases cited by the parties and in many other cases, we have not discussed why *Chapman* does or does not apply.

For example, in one of the cases cited by Ward, *State v. Hall*, 220 Kan. 712, 556 P.2d 413 (1976), the court apparently applied *Chapman*, although that conclusion is not clear from reading the decision. In *Hall*, the defendant sought a mistrial because of the prejudicial impact of his appearing for a brief time before the jury in prison clothing, despite his request to appear in his own clothes. The court found this to be a fundamental failure in the proceeding and explained:

"There can be no question that a practice of requiring an accused to stand trial in distinctive prison clothing, such as that described in the present case, may result in an unfair trial and may deny the prisoner the presumption of innocence mandated by the Kansas [Constitution] Bill of Rights, § 10 and K.S.A. 21-3109. This practice, if it exists in Kansas, should be discontinued.

. . . .

". . . However, the appearance of an accused in prison garb at a trial or some portion thereof, does not in and of itself constitute reversible error. It must be shown that the accused was prejudiced by such appearance in that such appearance resulted in an unfair trial. [Citations omitted.]" *Hall*, 220 Kan. at 714-15.

After examining the record, the *Hall* court concluded a mistrial was not warranted. In reaching that conclusion, the court first rejected the view that "an appearance in prison garb *per se* results in an unfair trial." *Hall*, 220 Kan. at 715. Additionally, the court concluded: "We can say beyond a reasonable doubt that the brief appearance of appellant in prison garb did not have [a] substantial effect upon the ultimate verdict. [Citation omitted.]" *Hall*, 220 Kan. at 715.

This last sentence is similar to the language in *Chapman*; at least it uses the *Chapman* benchmark of "beyond a reasonable doubt." Yet, it muddles the standard by concluding the appearance in jail clothing did not have a *"substantial* effect upon the ultimate verdict." (Emphasis added.) *Hall*, 220 Kan. at 715. Consequently, we cannot fit the statement from the case neatly into a *Chapman* pi-

geonhole. Nevertheless, even with this departure from the wording of *Chapman*, the *Hall* court cited to one of the first Kansas cases to apply *Chapman, State v. Fleury*, 203 Kan. 888, Syl. ¶ 2, 457 P.2d 44 (1969).

Similarly, in the other case cited by Ward, *State v. Alexander*, 240 Kan. 273, 729 P.2d 1126 (1986), the court appears to have applied the federal constitutional harmless error standard, without saying it was doing so. In *Alexander*, the issue was whether a mistrial was warranted because evidence had been admitted that showed the defendant was incarcerated. The court simply stated: "In applying the Kansas harmless error rule (K.S.A. 60-2105), a reviewing court must be able to declare the error had little, if any, likelihood of having changed the result of the trial and the court must be able to declare such a belief beyond a reasonable doubt." *Alexander*, 240 Kan. at 276. By itself, this discussion would not suggest that a federal constitutional harmless error analysis, as defined in *Chapman*, was being applied. Yet, it apparently was because the *Alexander* court cited to *State v. Johnson*, 231 Kan. 151, 159, 643 P.2d 146 (1982), and the *Johnson* decision, in turn, cited to *Chapman*. By using the standard of whether the error had "little, if any, likelihood of changing the result of the trial," the *Alexander* court continued a line of cases, beginning with *Fleury*, in which this court altered the language from *Chapman* while expressing its intent to apply *Chapman*.

*Fleury*, 203 Kan. 888, was decided approximately 2 years after the *Chapman* decision. In *Fleury*, the court first noted the *Chapman* holding that " 'before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' [Citation omitted]." *Fleury*, 203 Kan. at 893 (quoting *Chapman*, 386 U.S. at 24). The *Fleury* court then compared this standard to Kansas' harmless error rule, explaining:

"Our Kansas harmless-error rule has been incorporated in the statutory law of this state. (See K.S.A. 60-261 and K.S.A. 62-1718 [Corrick] [recodified at K.S.A. 60-2105].) Our harmless-error rule applies unless the error is of such a nature as to appear inconsistent with substantial justice. Our courts are directed to disregard

any error or defect in the proceedings which does not affect the substantial rights of the parties.

"The federal harmless-error rule declared in *Chapman* requires an additional determination by the court that such error was harmless beyond a reasonable doubt in that it had little, if any, likelihood of having changed the result of the trial." *Fleury*, 203 Kan. at 893.

Next, the court briefly reviewed the application of this additional determination by the courts of other states and by this court in the relatively short time between *Chapman* and *Fleury*. This discussion led the *Fleury* court to conclude:

"We are convinced our harmless-error rule has a sound basis in the jurisprudence of this state, and when our rule is to be applied to a federal constitutional error our courts should apply the same in the light of what was said in *Chapman*. By this we mean a court in applying our harmless-error rule must be able to declare the federal constitutional error had *little, if any, likelihood* of having changed the result of the trial, and the court must be able to declare such a belief beyond a reasonable doubt." (Emphasis added.) *Fleury*, 203 Kan. at 894.

The *Fleury* court did not further reconcile its statement that an error is harmless if it had "little, if any, likelihood" of having changed the result of the trial, with the "harmless beyond a reasonable doubt" language of the federal constitutional harmless error standard stated in *Chapman*. See *Chapman*, 386 U.S. at 24 ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").

Nevertheless, because the wording is different, periodically a question has arisen as to whether there is a difference between the standard Kansas applies and the *Chapman* standard. On each occasion when this court has addressed this question, we have always concluded the "little, if any, likelihood" standard is essentially the same standard as the one adopted in *Chapman*. For example, in *State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), we explained that, although the language is "somewhat different" from that used in *Chapman*, the "standard is essentially the same." See also *State v. Brown*, 280 Kan. 65, 76, 118 P.3d 1273 (2005) (citing *Kleypas* for recognition that Kansas' standard, although different from *Chapman*, was es-

sentially the same). Similarly, in *State v. Cosby*, 285 Kan. 230, 169 P.3d 1128 (2007), we reiterated that our use of " 'little, if any, likelihood of changing the result of the trial' " is equivalent to *Chapman*'s " 'willingness to declare a belief that it was harmless beyond a reasonable doubt.' " *Cosby*, 285 Kan. at 252. The basis for our repeated conclusion that there is no difference between the standards is explained, in part, by examining the source of the "little, if any, likelihood" phrase and discussing the analysis in *Chapman* in more detail.

The source of the "little, if any, likelihood" language is *Chapman* itself. However, the phrase is not found in the part of the opinion in which the United States Supreme Court established the federal constitutional harmless error standard. Instead, the phrase is in an earlier section of the opinion in which the Court considered whether a federal constitutional error can ever be harmless. *Chapman*, 386 U.S. at 21-22. The Court concluded that a federal constitutional error could be harmless and rejected the argument that all federal constitutional errors should require automatic reversal. In doing so, the Court noted that harmless error has been a longstanding feature of both federal law and the law of all 50 states. Harmless error rules, the Court found, "serve a very useful purpose insofar as they block setting aside convictions for small errors or defects that *have little, if any, likelihood of having changed the result of the trial*." (Emphasis added.) *Chapman*, 386 U.S. at 22.

After holding that a federal constitutional error can be harmless, the Court considered the appropriate analysis that should be applied. It looked to its recent decision in *Fahy v. Connecticut*, 375 U.S. 85, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963), holding that the erroneous admission of unconstitutionally obtained evidence required reversal because there was " 'a reasonable possibility the evidence complained of might have contributed to the conviction.' " *Chapman*, 386 U.S. at 23 (quoting *Fahy*, 375 U.S. at 86-87).

The *Chapman* Court then addressed the question of which party should have the burden of showing harmless error, presumably because *Fahy* was silent on the point:

"Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a

burden to show that it was harmless. It is for that reason that the original common-law harmless-error rule put the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment." *Chapman*, 386 U.S. at 24.

Integrating the burden of showing harmlessness with *Fahy's* "reasonable possibility that the evidence might have contributed to the conviction" standard, the *Chapman* Court created the federal constitutional harmless error standard:

"There is little, if any, difference between our statement in *Fahy v. Connecticut* about 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' and requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24.

While the United States Supreme Court concluded the standard in *Fahy* and *Chapman* had the same meaning, this court, in *Cosby*, noted the " 'little, if any, likelihood' " wording used by this court when applying the federal constitutional harmless error standard was different from that used in either of those cases. Even so, we concluded "unequivocally that neither [the *Chapman* nor *Fleury*] formulations differs substantively or functionally from *Fahy's* standard." *Cosby*, 285 Kan. at 252.

Our conclusion that there is no difference between phrasing the standard as "little, if any, likelihood" and "beyond a reasonable doubt" is validated by the United States Supreme Court's decision in *Neder v. United* States, 527 U.S. 1, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999). In *Neder*, the Court held that the federal constitutional harmless error standard asks: "Is it clear beyond a reasonable doubt that a rational jury would have [convicted the defendant] absent the error?" *Neder*, 527 U.S. at 18. This standard, the Court said, prevents setting aside convictions for small errors that have " 'little, if any, likelihood of having changed the result of the trial.' " *Neder*, 527 U.S. at 19. In other words, the phrase "little, if any, likelihood" states a level of certainty that is equivalent to "beyond

a reasonable doubt." See *Chapman*, 386 U.S. at 24 (the " 'reasonable possibility' " the error contributed to the verdict standard is the same as the "beyond a reasonable doubt" the "error did not contribute to the verdict" standard).

This high level of certainty—beyond a reasonable doubt, reasonable possibility, or little, if any, likelihood—was intended to set a standard that protects rights guaranteed by the United States Constitution. Yet, in time, this court began to occasionally use the language regarding "little, if any, likelihood" of affecting a verdict when analyzing nonconstitutional errors as well. *E.g., State v. Ricks*, 257 Kan. 435, 440, 894 P.2d 191 (1995) (concluding limiting instruction regarding purposes for which jury could consider prior conflicts between defendant and homicide victim "had little, if any, likelihood of changing the results of the trial, and any error therein is harmless."). When stating the analysis applicable to nonconstitutional errors in this way, this court has usually failed to discuss the difference in the level of certainty—*i.e.,* the standard of proof—or the burden of production to be applied in the consideration of nonconstitutional errors as compared to federal constitutional errors. (For a note on terminology, see *Microsoft v. i4i Limited Partnership*, ___ U.S. ___, 131 S.Ct. 2238, 2245 n.4, 180 L. Ed. 2d 131 (2011) (discussing "burden of proof" and distinguishing "burden of persuasion" ["specifying which party loses if the evidence is balanced"], "burden of production" [specifying which party must come forward with evidence at various stages in the litigation], and "standard of proof" [specifying " 'degree of certainty by which the factfinder' " or a reviewing court must be persuaded by the party bearing the burden of production].)

### 5. *Level of Certainty*

It is only the "little, if any, likelihood" language—in other words, the level of certainty that is imposed—in *Ricks* and numerous other nonconstitutional error cases that is difficult to reconcile with K.S.A. 60-261. The federal constitutional harmless error standard of *Chapman* and the Kansas harmless error statutes, K.S.A. 60-261 and K.S.A. 60-2105, are based on the same measuring point: whether the error affected substantial rights. As we have noted, in

Kansas we have used the same substantial rights standard, measured by whether an error changed the result of the trial, regardless of whether we are applying K.S.A. 60-261 and K.S.A. 60-2105 or *Chapman*. This is consistent with the United States Supreme Court's interpretation of the harmless error standard. As the Court made clear in *United States v. Dominguez Benitez*, 542 U.S. 74, 81, 124 S. Ct. 2333, 159 L. Ed. 2d 157 (2004), relief from error—whether under *Chapman*, *Kotteakos v. United States*, 328 U.S. 750, 764-65, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946)/Federal Rule of Criminal Procedure 52(a) (harmless error), or Federal Rule of Criminal Procedure 52(b) (plain error)—"is tied in some way to prejudicial effect, . . . [which] mean[s] error with a prejudicial effect on the outcome of a judicial proceeding." See also *United States v. Marcus*, 560 U.S. 258, 270, 130 S. Ct. 2159, 176 L. Ed. 2d 1012 (2010) (Stevens, J., dissenting) (Fed. R. Crim. Proc. 52[a] and [b] provide "a unitary standard" for relief from error "which turns on whether the error in question affected substantial rights[.]"); *Neder*, 527 U.S. at 7 (Fed. R. Crim. Proc. 52[a] "applies to *all* errors"; in applying Fed. R. Crim. Proc. 52[a]'s harmless error analysis to constitutional errors, reviewing court must " 'disregar[d]' errors that are harmless 'beyond a reasonable doubt' ").

Under the United States Supreme Court's analysis, although relief for any type of error—*i.e.*, constitutional, harmless, or plain—is based on the same benchmark, effect on the outcome, the analysis for each type of error is formulated differently to set a higher or lower threshold or level of certainty as to whether the error affected the outcome. In other words, the standard of proof varies by the degree of certainty by which a court must be persuaded that the error did not affect the outcome. See *Dominguez Benitez*, 542 U.S. at 86 (Scalia, J., dissenting) (the Court has created too many gradations in the "standards of probability relating to the assessment of whether the outcome of the trial would have been different" if the error had not occurred); *Brecht v. Abrahamson*, 507 U.S. 619, 653-56, 113 S. Ct. 1710, 123 L. Ed. 2d 353, *reh. denied* 508 U.S. 968 (1993) (O'Connor, J., dissenting) (harmless error requires the reviewing court to determine whether it has "sufficient confidence that the verdict would have remained unchanged even

if the error had not occurred"; only difference between *Chapman* and the *Kotteakos*/Fed. R. Crim. Proc. 52 standard "is the degree of confidence" the reviewing court must have that the error did not affect the outcome); see also (Traynor, The Riddle of Harmless Error, pp. 34, 43 (1970) (appellate courts must assess the risk that an error affected the outcome on a "sliding scale of probabilities"); Walker, *Harmless Error Review in the Second Circuit*, 63 Brook L. Rev. 395, 399 (1997) (harmless error standards establish the "degree of certainty required . . . before a court can declare [an error] harmless").

The *Chapman* "harmless beyond a reasonable doubt" threshold requires the highest level of certainty that the error did not affect the outcome. See *Brecht*, 507 U.S. at 637 (quoting *Chapman*, 386 U.S. at 24, which quoted *Fahy*, 375 U.S. at 86, and concluding that under the *Kotteakos* standard, relief from error is granted only when the error had an actual effect on the outcome; under *Chapman*, relief from error is required "merely because there is a ' "reasonable possibility" ' that trial error contributed to the verdict"); *United States v. Lane*, 474 U.S. 438, 446 n.9, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986) (*Chapman*'s constitutional harmless error standard "is considerably more onerous than the standard for nonconstitutional errors" adopted in *Kotteakos*, 328 U.S. 750).

Under federal law, all other nonstructural errors (nonconstitutional errors, errors on collateral review, and plain errors) are subject to a less stringent threshold; such errors must be held harmless where there is no "reasonable probability" the error affected the outcome. See *Marcus*, 130 S. Ct. at 2164 ("reasonable probability" that the error affected outcome, not "any possibility," is the appropriate standard for determining whether a plain error affected substantial rights under Fed. R. Crim. Proc. 52[b]); *Dominguez Benitez*, 542 U.S. at 81-82 (a plain error " 'affects substantial rights' " as used in Fed. R. Crim. Proc. 52[b] where there is a " 'reasonable probability' " that, but for the error, the outcome would have been different).

Which threshold or level of certainty—reasonable probability or reasonable possibility—should be applied to K.S.A. 60-261 and K.S.A. 60-2105 when nonconstitutional error is involved has not

been as clear, however. Recently, the point was addressed in *State v. Shadden*, 290 Kan. 803, 830, 235 P.3d 436 (2010), in which we relied on *Marcus*, 130 S. Ct. 2159, to reject the threshold of a " 'possibility' " that an error had affected the outcome of a trial.

In *Marcus*, the United States Supreme Court discussed the harmless error provision of Fed. R. Crim. Proc. 52(b), which permits a federal appellate court to recognize "plain error that affects substantial rights." The Court detailed four circumstances in which the rule could be applied, one of which is when an error " 'affected the appellant's substantial rights, which in the ordinary case means' it 'affected the outcome of the district court proceedings.' " *Marcus*, 130 S. Ct. at 2164. The Court discussed the level of certainty required in this circumstance, stating: "In the ordinary case, to meet this standard an error must be 'prejudicial,' which means that there must be a *reasonable probability* that the error affected the outcome of the trial. [Citations omitted.]" (Emphasis added.) *Marcus*, 130 S. Ct. at 2164.

Citing *Marcus*, in *Shadden*, 290 Kan. at 830, we concluded the Kansas Court of Appeals had erred in reversing a conviction based on the mere possibility that a nonconstitutional error had affected the outcome of a trial. Based on *Marcus*, we applied a reasonable probability level of certainty to determine whether the error affected the outcome of the proceeding.

Synthesizing these various holdings, we conclude that before a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial. (Because Ward claims a violation of rights guaranteed by

the United States Constitution, the question of whether an error that implicates a right guaranteed by the Kansas Constitution but not the United States Constitution can be declared harmless and, if it can, what level of certainty would apply is not presented in this case and, therefore, is not determined. Likewise, we do not address the analysis to be applied in the context of a collateral review of error. See *Brecht*, 507 U.S. at 630-31).

That said, with the clarification that a reasonable probability threshold applies under K.S.A. 2010 Supp. 60-261 and K.S.A. 60-2105, it is confusing to talk about an error "having little, if any, likelihood" of affecting a trial's outcome. This language suggests a reasonable doubt threshold, which is the context in which the language originated. In contrast, the wording used by the United States Supreme Court when discussing harmless error in a non-constitutional error setting does not include the phrase "little, if any, likelihood" and, therefore, avoids the potential for confusion. The Court considers all errors—constitutional, harmless, and plain—by the benchmark of affecting substantial justice, meaning affecting the outcome of the proceeding. Then, it applies the appropriate level of certainty. Our review of the history that has resulted from the varying wording this court has used persuades us that the analysis under K.S.A. 2010 Supp. 60-261 and K.S.A. 60-2105 should be phrased with similar consistency and without the "little, if any, likelihood" phrase.

In addition, we clarify that our frequent reference, primarily in prosecutorial misconduct cases, to satisfying both harmlessness standards—K.S.A. 2010 Supp. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)—should not be read to imply there are two different tests. *E.g.*, *State v. Kemble*, 291 Kan. 109, 121-22, 238 P.3d 251 (2010) (using language of both standards); *State v. Tosh*, 278 Kan. 83, Syl. ¶ 2, 91 P.3d 1204 (2004) (discussing basis for statement). Rather, as discussed, there is one benchmark of whether substantial justice is affected with different levels of certainty required.

### 6. Burden of Production

One further point of confusion remains: Who carries the burden of production to establish that there is no reasonable possibility or reasonable probability that the error affected or will affect the outcome? In the context of a motion for mistrial, we have frequently imposed the burden of production on the defendant. See, *e.g.*, *State v. Foster*, 290 Kan. 696, 717, 721, 233 P.3d 265 (2010) (statutory harmless error). In other cases, we have often stated the standard in a burden-neutral fashion, merely concluding an appellate court must be convinced the error did not affect the outcome of the trial. *E.g.*, *State v. Wells*, 289 Kan. 1219, 1233, 1238-39, 221 P.3d 561 (2009) (statutory harmless error and *Chapman*).

A recent case considered by the United States Supreme Court raises a question of whether the burden can be imposed on a defendant if the federal constitutional harmless error standard is being applied. In *Gamache v. California*, ___ U.S. ___, 131 S. Ct. 591, 178 L. Ed. 2d 514 (2010), the Court denied a petition for writ of certiorari in which a criminal defendant sought review of the California Supreme Court's finding that a federal constitutional error was harmless. Although the Court unanimously voted to deny the petition, four justices joined in a statement pointing out that the California court had incorrectly required a defendant to establish prejudice from the alleged error, stating:

"Under our decision in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), the prosecution must carry the burden of showing that a constitutional trial error is harmless beyond a reasonable doubt. See also *Deck v. Missouri*, 544 U.S. 622, 635, 125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005) ('[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury . . . [t]he State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained" ' (quoting *Chapman*, 386 U.S. at 24, 87 S.Ct. 824)); *United States v. Dominguez Benitez*, 542 U.S. 74, 81, n.7, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) ('When the Government has the burden of addressing prejudice, as in excusing preserved error as harmless on direct review of the criminal conviction, it is not enough to negate an effect on the outcome of the case' (citing *Chapman*, 386 U.S., at 24, 87 S.Ct. 824); *Arizona v. Fulminante*, 499 U.S. 279, 295-296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) ('The Court has the power to review the record *de novo* in order to determine an error's harmlessness. In so doing, it must

be determined whether the State has met its burden of demonstrating that the "error" did not contribute to [defendant's] conviction' (citations omitted)).

"The California Supreme Court, however, stated, '[I]n the absence of misconduct, the burden remains with the *defendant* to demonstrate prejudice under the usual standard for ordinary trial error.' 48 Cal. 4th, at 397, 106 Cal.Rptr.3d 771, 227 P.3d, at 387 (emphasis added). It is not clear what the court intended in allocating the burden to the defendant to demonstrate prejudice, but if it meant to convey that the defendant bore the burden of persuasion, that would contravene *Chapman*. [Citations omitted.]" *Gamache*, 131 S. Ct. at 592.

The four justices concluded the allocation of the burden did not impact the conclusion that the error was harmless in *Gamache*. Nevertheless, the four justices noted that "the allocation of the burden of proving harmlessness can be outcome determinative in some cases" and "in future cases the California courts should take care to ensure that their burden allocation conforms to the commands of *Chapman*." *Gamache*, 131 S. Ct. at 593.

We heed this warning even though *Gamache* is not controlling as it is merely a statement by four justices related to a denial of certiorari. We do so because we find the justices' statements persuasive for several reasons. First, "because the standard of review (like the applicability of harmless error) is part and parcel of the federal right itself, a state court may be prohibited from adopting standards of review that are more deferential than the standards adopted by federal courts." 7 LaFave, Israel, King & Kerr, Criminal Procedure § 27.5(e) (3d ed. 2007). Second, we agree with the four justices that the allocation of the burden can be outcome determinative and, in such a case, *Chapman* would require the party favored by the error—usually the State—to carry the burden of production. Third, a state court decision that is contrary to or applies the federal constitutional harmless error standard "in an 'objectively unreasonable' manner," is subject to federal habeas review. *Mitchell v. Esparza*, 540 U.S. 12, 17-18, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003). Finally, on occasion we have appropriately imposed the burden on the State as the party benefitting from the alleged error. *E.g., State v. Kleypas*, 272 Kan. 894, 1084, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002).

Consequently, the better practice is to express the federal constitutional harmless error standard as we did in *Kleypas*: "A con-

stitutional error may be declared harmless where the [party benefitting from the error] proves beyond a reasonable doubt that the error complained of did not [affect substantial rights, meaning it did not] contribute to the verdict obtained." *Kleypas*, 272 Kan. at 1084 (citing *Chapman*, 386 U.S. at 24).

Because we ultimately apply the federal constitutional harmless error standard in this case, we need not determine which party carries the burden of production regarding the effect of a nonconstitutional error under K.S.A. 60-261 or K.S.A. 60-2105.

### 7. *Standard of Review Summary*

With these different points in mind, we restate the two-step test that frames the analysis for a motion for mistrial: First, was there a fundamental failure in the proceeding? Second, if so, did this fundamental failure result in an injustice? To determine whether an error makes it impossible to proceed with the trial without injustice, a trial court must assess whether the fundamental failure affected a party's substantial rights, which means it will or did affect the outcome of the trial in light of the entire record. The degree of certainty by which the court must be persuaded that the error did not affect the outcome will vary depending on whether the fundamental failure infringes upon a right guaranteed by the United States Constitution. If it does not, the trial court should apply K.S.A. 60-261 and determine if there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record. If the fundamental failure does infringe upon a right guaranteed by the United States Constitution, the trial court should apply the constitutional harmless error analysis defined in *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 (1967), in which case the error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict. Regardless of whether the error is constitutional, one factor to be considered is whether any damage caused by the error can be or was removed or mitigated by ad-

monition, instruction, or other curative action. An appellate court reviewing the second step for an injustice will review the entire record and use the same analysis, applying K.S.A. 60-261 and K.S.A. 60-2105 or else *Chapman*, depending on the nature of the right allegedly affected.

## B. *Right to a Fair Trial*

Applying this two-step test, we must first determine whether the trial court erred in determining it was not a fundamental failure in the trial to allow West and Jackson to be identified as Ward's associates while they were dressed in jail clothing. Again, the trial court will have abused its discretion if we determine this conclusion (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based. See *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010).

The State argues that the issue relates to the trial court's control of the courtroom and trial, an area where traditionally the trial court is given broad discretion. See, *e.g.*, *State v. Kemble*, 291 Kan. 109, 114, 238 P.3d 251 (2010). On the other hand, Ward suggests that there was a fundamental failure in her trial and the trial court's determination was based on an error of law that failed to recognize an infringement on her right to be presumed innocent and her right to a fair trial, both of which are fundamental constitutional rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. See *Estelle v. Williams*, 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, *reh. denied* 426 U.S. 954 (1976) ("The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice."). The presumption of innocence is founded on the principle that "one accused of a crime is entitled to have guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspi-

cion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S. Ct. 1930, 56 L. Ed. 2d 468 (1978). As previously noted, in addition to citing *Estelle* as support, Ward cites to *State v. Alexander*, 240 Kan. 273, 729 P.2d 1126 (1986), and *State v. Hall*, 220 Kan. 712, 556 P.2d 413 (1976).

*Estelle, Alexander*, and *Hall* are distinguishable from this case, however, because in those cases the prejudice arose from circumstances showing that the *defendant* was in jail. The decisions did not discuss the impact of evidence showing that someone other than the defendant was in jail. Before us, neither party has cited any authority on the issue of whether witnesses for the prosecution may identify individuals attired in jail clothing and seated in the courtroom as associates of the defendant. Our research has provided minimal guidance.

### 1. *Witness in Jail Clothing*

What this research has revealed is that the law is less settled regarding whether witnesses should be permitted to testify in jail clothing, but a majority of jurisdictions have concluded that requiring a witness who is called by the State to testify in jail clothing may affect the defendant's right to a fair trial. See Annot., 16 A.L.R. 4th 1356. The results are not the same if the witness is called by the defense. We addressed this situation in *State v. Bradford*, 254 Kan. 133, 864 P.2d 680 (1993).

In *Bradford*, the defendant moved for a mistrial after a defense witness testified while in chains and jail clothing. The defendant argued the use of chains could have caused jurors to base their evaluation of the witness' credibility on unacceptable factors. The trial court denied the motion. On appeal, the *Bradford* court observed that the defendant called this witness to testify concerning events that allegedly occurred while he and the witness were incarcerated. The defendant did not request that either the jail clothing or chains be removed. The *Bradford* court stated that the witness' "courtroom appearance was controlled by Bradford, not by the State." *Bradford*, 254 Kan. at 143. Finding no abuse of discretion on the part of the trial court, we further noted that the court

offered to have the chains removed when the witness' appearance was first brought to its attention. *Bradford,* 254 Kan. at 143.

The facts of *Bradford* are so distinguishable the decision is not particularly helpful. Here, we do not have a witness being called by the defense; rather the State controlled West's and Jackson's appearance in the courtroom. Further, the individuals wearing jail clothing in our case were not witnesses and had not been listed as potential witnesses, so there was no advance notice to Ward. Despite these distinctions, it is noteworthy that *Bradford's* rationale implies that a witness ordinarily should not testify in a jury trial while wearing jail clothing.

To emphasize the appropriateness of that conclusion and to suggest that the conclusion's doctrinal basis is the presumption of innocence, Ward points us to the rationale used by appellate courts in other jurisdictions that have disapproved of the practice of having witnesses testify in jail clothing. These cases—*Gibson v. State,* 233 S.W.3d 447 (Tex. App. 2007), and *State v. Kuchera,* 198 N.J. 482, 969 A.2d 1052 (2009)do not fully support her argument, however.

In the first of these cases, *Gibson,* the Texas Court of Appeals found it was within the trial court's discretion to require witnesses to appear in jail clothing if the circumstances warranted it. There, the defendant knew the witness was in jail and would likely be called to testify, but the defendant did not make a timely request that the witness be permitted to testify in street clothing. The trial court instructed the jury to disregard the witness' jail clothing and handcuffs. Although the Texas Court of Appeals believed "it is better to require that no witness testify in jail clothing," it held that the trial court did not abuse its discretion in denying the motion for mistrial. *Gibson,* 233 S.W.3d at 453.

In the second case cited by Ward, *Kuchera,* the New Jersey Supreme Court concluded that as a general rule, witnesses for either the State or defense should not testify in jail clothing. The general rule, however, was tempered by the court's recognition that such attire may be "affirmatively permitted by the trial court in the exercise of its discretion." *Kuchera,* 198 N.J. at 486. Still, the court narrowed that discretion by indicating that requiring a witness to

testify in jail clothing " 'further[s] no vital State interest,' " *Kuchera,* 198 N.J. at 499 (quoting *State v. Artwell,* 177 N.J. 526, 539 832 A.2d 295 [2003]), and it similarly prejudices the defendant in terms of his witness' credibility and the suggestion of " 'guilt by association.' " *Kuchera,* 198 N.J. at 499 (quoting *Artwell,* 177 N.J. at 539).

Ward points out that unlike the situations in *Gibson* and *Kuchera,* Ward, through her counsel, did voice an objection to the presence of the jail-clothed individuals. She also acknowledges, however, that these cases do not directly address the issue before this court where it is the appearance of a nonwitness that raises a question of prejudice.

Furthermore, several other cases regarding witnesses do not support Ward's arguments. While these courts have recognized the risk of unfair prejudice to a defendant when witnesses are forced to testify in jail clothing or restraints, many have concluded that the practice does not adversely affect the defendant's presumption of innocence or imply that the defendant is disposed to commit crimes. Rather, the potential prejudice has been seen as arising because of the impact on the witness' credibility. See, *e.g., Harrell v. Israel,* 672 F.2d 632, 635 (7th Cir. 1982) ("Although the shackling of defense witnesses may be less prejudicial to the accused because it does not directly affect the presumption of innocence, . . . nevertheless it may harm his defense by detracting from his witness' credibility."); *People v. Froehlig,* 1 Cal. App. 4th 260, 264, 1 Cal. Rptr. 2d 858 (1991) ("The appearance of a defense witness attired in prison clothes does not, of course, adversely affect the presumption of innocence or carry with it the inference that the defendant is a person disposed to commit crimes. . . . The credibility of a defense witness observed by the jury in prison attire may be suspect, but the prejudicial impact upon the defense is considered 'less consequential.' "); *Commonwealth v. Brown,* 364 Mass. 471, 475, 305 N.E.2d 830 (1974) ("The shackling of a witness . . . may influence a jury's judgment of credibility and further hurt the defendant in so far as the witness is conceived to be associated with him."); *Hightower v. State,* 123 Nev. 55, 58, 154 P.3d 639 (2007) ("[R]equiring an incarcerated defense witness to appear in prison clothing may prejudice the accused by undermining the witness's

credibility in an impermissible manner."); *State v. Hartzog*, 96 Wash. 2d 383, 399, 635 P.2d 694 (1981) ("While a shackled witness may not directly affect the [defendant's] presumption of innocence, it seems plain that there may be some inherent prejudice to defendant, as the jury may doubt the witness' credibility.").

In this case, we are not concerned about the credibility of West or Jackson, who did not testify, and these cases do not support a conclusion that their presence in the courtroom while in jail clothing infringed on Ward's right to be presumed innocent.

### 2. *Bystanders in Jail Clothing*

Similarly, in the few cases we found where a prisoner was brought into the courtroom but not called as a witness, the courts questioned the practice but found the potential prejudice to be less than that caused by a defendant in jail clothing appearing before a jury.

For example, in *Hedrick v. State*, 6 So. 3d 688 (Fla. Dist. App. 2009), the defendant claimed that defense counsel should have objected to the codefendants appearing at trial in shackles and prison clothing. The codefendants were brought into the courtroom during the testimony of one of the victims, who identified the defendant as the tallest of the attackers. The State demonstrated the accuracy of this opinion by displaying the codefendants. The defendant's motion alleged that the jury may have perceived him as guilty by association because the codefendants' appearance in prison clothing and shackles indicated that they were in custody. Yet, the *Hedrick* court stated that the defendant failed to show prejudice. The court observed that the defense was that the codefendants were the ones who had beaten the victim, and the defendant was merely a bystander. The court determined that "[t]he co-defendants' appearance in prison garb had no bearing on the defense." *Hedrick*, 6 So. 3d at 694.

In addition, the *Hedrick* court cited to a Mississippi decision, *Morgan v. State*, 818 So. 2d 1163 (Miss. 2002), in which the court considered the possible error of a State's witness appearing before the jury in shackles or jail clothing. The Mississippi court noted a line of cases holding that it was prejudicial to bring a defendant or

a defense witness into the courtroom in shackles or jail clothing but distinguished the cases because the witness was a prosecution witness. Consequently, the court reasoned the defense was not prejudiced by any damage to the witness' credibility. *Morgan*, 818 So. 2d at 1174.

Another case, *Craig v. State*, 761 S.W.2d 89 (Tex. App. 1988), is also similar to this case, although the association between the prisoner and the defendant was weaker. In *Craig*, during the State's case-in-chief, a female witness was called to the stand to establish certain events in a bar, which allegedly occurred before the abduction and killing of the victim. The witness testified that she observed the victim with the defendant and a "taller man with long, dark or black hair." *Craig*, 761 S.W.2d at 93. After the witness was cross-examined by defense counsel, the State brought a male person into the courtroom in jail clothing and leg irons and asked the witness if she recognized him. She responded that she did not. Defense counsel made a motion for mistrial, arguing that the individual's presentation in jail clothing and leg irons was prejudicial.

The Texas Court of Appeals affirmed the trial court's denial of the motion and distinguished the case from those where the defendant or a witness is forced to testify in restraints or jail clothing. *Craig*, 761 S.W.2d 94-95. The *Craig* court stated:

"Under our record, this male person was not identified and was not presented to the jury as a witness. Some male person simply appeared in the courtroom. This person was not placed in the witness box. . . .

". . . Under this entire record, we find that the appearance of this male person in the courtroom, in restraint and in jail attire, made no contribution to the conviction or to the punishment of the [defendant] and we so find beyond a reasonable doubt." *Craig*, 761 S.W. 2d at 94.

Finally, a nonwitness was brought into the courtroom in *Reese v. State*, 241 Ga. App. 350, 526 S.E.2d 867 (1999). The defendant argued that bringing a codefendant into the courtroom in jail clothing for the purpose of identification was prejudicial because it associated the defendant with someone convicted of a crime. In rejecting this argument, the court noted that the jury was not told that the codefendant had been convicted. *Reese*, 241 Ga. App. at 353; see also *Cook v. Beto*, 425 F.2d 1066, 1066-67 (5th Cir. 1970),

*cert. denied* 400 U.S. 944 (1970) (summary rejection of habeas corpus claim based on defendant's codefendant being brought into the courtroom for identification while dressed in jail clothing; court found that this resulted in no prejudice to the defendant).

### 3. *Synthesizing and Applying These Cases*

All of these cases, whether relating to a defendant, witness, or nonwitness being brought into the courtroom in jail clothing, are expressly or impliedly critical of the practice. We agree with this criticism and conclude, in the first step of our analysis, that given the consensus in the case law that jail clothing taints a trial, a trial court almost always abuses its discretion to control the courtroom when it allows a defendant, witness, or nonwitness to be brought before a jury in jail clothing without an articulated justification explaining why it is necessary for the person to wear jail clothing and does not consider giving an admonition or instruction to the jury that it should not consider the clothing or the person's incarceration. (In some cases, an admonition may not be advisable, but the pros and cons should be weighed.) As we have noted, discretion is abused when a trial court does not take into account the legal principles that control its decision. In this situation, the case law, including decisions of the United States Supreme Court, indicate the trial court should avoid the taint of jail clothing on a trial. Ignoring this case law is an abuse of discretion. See *Gonzalez*, 290 Kan. at 755-56.

While the Court of Appeals acknowledged the general proposition that West and Jackson should not have been in jail clothing, it found a proper exercise of discretion because of the purposes given by the State for wanting them identified. Yet, this justification merely explains the reason for their presence; it does not suggest any justification for the two to be in jail clothing or explain why arrangements could not have been made for them to appear in street clothes.

### C. *Prejudice: Were Substantial Rights Affected?*

Nevertheless, as our discussion has revealed, the jail clothing taint on this trial does not mean that a mistrial must be declared.

Typically, after finding a fundamental failure in the proceeding, a trial court would assess the prejudicial effect. Here, however, the trial court did not find error or misconduct and, therefore, did not determine whether curative instructions or admonitions were warranted and did not gauge the prejudice caused by the error.

In cases such as this, where an appellate court finds that the trial court erred in its first step of analysis regarding whether there is a fundamental failure in a proceeding and consequently did not make a prejudice assessment, the appellate court may undertake the second step without benefit of the trial court's assessment. The role of the appellate court in this circumstance is to review the entire record and determine de novo if a trial court's error was harmless. K.S.A. 60-2105. This is a role an appellate court frequently undertakes, and K.S.A. 60-261 and K.S.A. 60-2105 or else *Chapman*, 386 U.S. 18, provide the tools for this assessment.

In applying those tools, the Court of Appeals imposed the burden of production on Ward, *i.e.*, required Ward to come forward with evidence, and, without stating the level of certainty required, applied the substantial rights threshold, citing *State v. Albright*, 283 Kan. 418, 425-26, 153 P.3d 497 (2007); see K.S.A. 60-261. If a right guaranteed by the United States Constitution is implicated, as Ward suggests, both the trial court and the Court of Appeals should have applied the federal constitutional harmless error standard (beyond a reasonable doubt/reasonable possibility threshold) and imposed the burden of production on the State.

In assessing whether the Court of Appeals erred in this regard, we note that courts from other jurisdictions have generally not found the presumption of innocence to be implicated when the individual wearing the jail clothing was someone other than the defendant. A trend is not as clear with regard to whether the due process right to a fair trial has been infringed, however. Nevertheless, we conclude that the right to a fair trial and the right to a presumption of innocence as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution are implicated when individuals in jail clothing are identified to the jury as associates of a defendant. This means *Chapman* should have been applied by the Court of Appeals when assessing prejudice and will

be applied by this court in determining if the error was harmless. Again, under this standard, the error may be declared harmless where the State, as the party benefitting from the error, proves beyond a reasonable doubt that the error complained of did not affect substantial rights, meaning there is not a reasonable possibility that the error contributed to the verdict obtained.

We recognize that imposing that burden on the State at this point changes the rule because, as noted, past Kansas cases have placed the burden of establishing prejudice on the defendant in mistrial cases. This shift in burden is of no consequence in this case, however, because the State presented arguments as to why there was no prejudice. These arguments are consistent with those made in the cases we have discussed in which courts found it harmless to have a nonwitness in the courtroom in jail clothing.

It is significant that in some of those cases, the appellate court applied the higher level of certainty and still found the presence of a nonwitness in jail clothing to be harmless. We do not read these cases as basing this decision solely on the fact that the conduct in question occurred outside the witness stand. To this extent the cases are consistent with Kansas precedent, which has rejected such a distinction. See, *e.g.*, *State v. Leaper*, 291 Kan. 89, 96-97, 238 P.3d 266 (2010) (mistrial requested after juror reported seeing witness take offered exhibit and place in pocket while leaving courtroom; fact that witness' negative behavior occurred in courtroom rather than on witness stand was not dispositive on question of whether mistrial should have been granted); *State v. Foster*, 290 Kan. 696, 718, 233 P.3d 265 (2010) (mistrial requested after defendant's weeping father left courtroom during rape victim's testimony). Rather, it appears to be that other factors—such as the strength of the evidence against the defendant and an attenuated or unexplained connection between the individual's incarceration and the charged crimes—weigh against a finding of prejudice.

Considering those factors, although West was identified as a coconspirator of Ward, there was never any statement that he had been found guilty of that charge. Further, Ward's own arguments attempted to point a finger at West or others to suggest that while Ward was present at the scene of the crimes she was not directly

involved in the cocaine sales. In addition, Ward raised the possibility of misidentification. For example, defense counsel implied there was a mistake when Ward was identified in a photo lineup and suggested reasonable doubt arose because Ward and her daughter, Jackson, looked very similar in the photo lineup. One could even conclude that the presence of West and Jackson during transactions benefitted the defense's theory, which focused on the officers' admissions that they never saw Ward physically hand over the drugs to Stinnett, in an attempt to suggest someone else made the sales. Also, the defense at least attempted to imply that the similar appearance of Ward and Jackson could lead to misidentification.

Finally, the State presented substantial direct and circumstantial evidence connecting Ward to four separate drug transactions. We are convinced beyond a reasonable doubt that the State has met its burden of proof in showing that the witnesses' identification of West and Jackson dressed in jail clothing did not affect the outcome of the trial.

## II. SUFFICIENCY OF EVIDENCE

The other issue argued by Ward is that the evidence was insufficient to support a verdict. Before us, Ward modifies her sufficiency of the evidence argument and presents two questions. The first question was not raised before the Court of Appeals or in Ward's petition for review, and we decline to consider the question. The second question was discussed by the Court of Appeals, and we affirm.

### A. *Failure to Preserve K.S.A. 65-4161(d) Issue*

The specific question raised for the first time in Ward's brief to this court is whether the State failed to establish that Garfield School, which had been identified as a school located close to a laundromat where some of the drug transactions occurred, was a school as defined in K.S.A. 65-4161(d). This statute prohibits certain drug transactions within 1,000 feet of a structure "used by a unified school district or an accredited nonpublic school for student instruction or attendance or extracurricular activities of pupils

enrolled in kindergarten or any of the grades one through 12." At trial, there was evidence that Garfield School was a public school attended by kindergartners through third graders, but Ward argues there was no evidence that the school was used by a unified school district or an accredited nonpublic school. See *State v. Star*, 27 Kan. App. 2d 930, 936, 10 P.3d 37, *rev. denied* 270 Kan. 903 (2000) (to sustain conviction for sale of cocaine within 1,000 feet of a school, State must present evidence that structure referred to as a school complies with the definition in 65-4161[d]); see also *State v. West*, Nos. 99,063, 99,067, 2008 WL 4849472 (Kan. App. 2008) (unpublished opinion), *rev. denied* 289 Kan. 1285 (2009) (reversing three convictions for insufficient evidence of sale of cocaine within 1,000 feet of a school because State failed to prove that the building within 1,000 feet of the three sale transactions was part of unified school district or accredited nonpublic school).

As we have noted, this issue was not raised before the Court of Appeals or in Ward's petition for review. Rather, before the Court of Appeals and in her petition for review, Ward did not point to a failure to prove any specific element of a crime and did not distinguish one count from another. In a case that is before the Kansas Supreme Court on a granted petition for review, an issue cannot be raised for the first time before the Supreme Court. Any issue that was not presented to the Kansas Court of Appeals is deemed abandoned. See *Osterhaus v. Schunk*, 291 Kan. 759, 794, 249 P.3d 888 (2011); see also Supreme Court Rule 8.03(a)(5)(c) (2010 Kan. Ct. R. Annot. 69) ("Issues not presented in the petition, or fairly included therein, will not be considered by the court.").

Consequently, we will not address the merits of Ward's claim that the State failed to establish that Garfield School complies with the definition in K.S.A. 65-4161(d).

B. *Sufficiency of the Evidence in General*

In her second issue, Ward reasserts the arguments she made before the Court of Appeals, *i.e.*, that there was no direct evidence that Ward was involved in the 17 crimes for which she was convicted and that Stinnett's testimony lacked credibility.

Our standard of review is well known and was properly cited by the Court of Appeals: When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Northcutt*, 290 Kan. 224, 231, 224 P.3d 564 (2010); *State v. Gant*, 288 Kan. 76, 83, 201 P.3d 673 (2009). We agree with the Court of Appeals that there is strong evidence of Ward's involvement, including direct evidence, and the issue of credibility was resolved by the jury and will not be reweighed on appeal.

In the light most favorable to the prosecution, Stinnett's testimony established that the four controlled drug buys took place. Certainly, Stinnett's credibility was in question during the trial, but the defense was given ample opportunity to thoroughly cross-examine her. Additionally, the jury was made aware that Stinnett was cooperating with law enforcement in exchange for the dismissal of charges against her, some of which were drug related, and the trial court gave a cautionary instruction regarding the testimony of a confidential informant. As aptly noted by the Court of Appeals, the credibility of Stinnett was solely within the province of the jury and not within that of an appellate court, which does not reweigh evidence, assess the credibility of the witnesses, or resolve conflicting evidence. *Gant*, 288 Kan. at 80.

Ward also asserts her convictions should be reversed because there is only circumstantial evidence to support them. The legal premise of this argument is ill-founded because the law clearly allows a conviction of even the gravest offense to be based on circumstantial evidence. *State v. Becker*, 290 Kan. 842, 852, 235 P.3d 424 (2010) (stating general principle and noting that specific intent need not be shown by direct proof but may be shown by acts, circumstances, and reasonable inferences "deducible therefrom"); *State v. Tyler*, 286 Kan. 1087, 1095, 191 P.3d 306 (2008) (circumstantial evidence is evidence of events or circumstances from which reasonable factfinder may infer existence of material fact in issue). Certainly, Ward was free to argue to the jury that the circumstantial nature of much of the evidence created reason-

able doubt, but on appeal we accept the circumstantial evidence in the light most favorable to the State when assessing sufficiency. Further, the factual premise of Ward's argument is also ill-founded because there was direct evidence—observations—of the transactions by officers and Stinnett.

In this regard, in Ward's petition for review and supplemental arguments, she focuses on the fact that Detective Wagenseller admitted during his testimony that he did not actually see Ward and Stinnett exchange money or cocaine during any of the four controlled drug buys, that he never recovered any marked purchase money from Ward, and that no law enforcement officers actually saw Stinnett dial Ward's phone number. And even though there was a videotape of some of the controlled buys, Deputy Troy Briggs testified Ward could not actually be seen in any of the recordings. Briggs indicated that he saw Stinnett enter and exit Ward's house on January 25 and January 31, 2007, but he admitted that he could not observe what happened inside.

Yet, the officers observed many aspects of the transactions, saw Ward in the blue Suburban, overheard conversations, and verified many aspects of Stinnett's testimony. For example, Officer Roy Williams testified that prior to this case he had known Ward for about 5 years and had numerous conversations with Ward in his capacity as a narcotics officer. Williams confirmed that Stinnett dialed Ward's phone number in each of the controlled drug buys. He also testified that he recognized Ward's voice on the audiotapes of the transactions and that he knew Ward owned a blue Suburban. Other officers explained the steps taken to control the buys and to maintain audio and video surveillance that allowed them to witness the general nature of the events.

In light of this evidence, we conclude that, even though the officers who monitored the drug transactions did not witness the actual exchange of money and cocaine between Ward and Stinnett, their observations and testimony, when considered along with Stinnett's testimony, provide more than sufficient evidence that Ward sold Stinnett crack cocaine on the four separate occasions identified in the charges.

Affirmed.

PAUL E. MILLER, District Judge, assigned.

\* \* \*

ROSEN, J., dissenting: I agree with the majority's well-reasoned opinion up to the point where it finds the error in the trial court's failure to grant the defendant's motion for mistrial harmless. As the majority concludes, a trial court almost always abuses its discretion to take control of the courtroom when it allows witnesses or nonwitnesses to be brought before a jury in jail clothing without articulated justification.

Much thought and planning has been given to the creation of the courtroom setting in which the pursuit of justice is to be carried out. We strive for an ambience of dignity, consideration, respect, and, most of all, impartiality, in which each witness' testimony is given its due evidentiary weight. When inmates in their inescapably identifiable bright orange prison attire are purposely paraded into the courtroom as part of the staging of the prosecution of an accused, it cannot help but prejudice the jury's perception of the lifestyle and associations of the defendant, thereby compromising the heart of the impartial proceedings we so fervently strive to achieve.

In this case, the State's procuring of the involuntary appearance of West and Jackson in the courtroom gallery and their forced participation in Ward's trial while wearing and being identified specifically by their prison attire clearly set them apart from that group of peers and citizens that are typically observers of a public trial. Repeatedly calling the jury's attention to the orange jumpsuits that these individuals were wearing was blatantly prejudicial in that it directly called the jury's attention to the relationship between the defendant and the spectators in "oranges," which served to declare the defendant "guilty by sartorial association." All that was

missing was a theater orchestra playing a bar show/vaudeville parody of Stephen Sondheim's melody entitled "Send in the Cons."

I regard this tactic as an impermissible manipulation by the prosecution that created immeasurable prejudice to the defendant, which could not be overcome by the weight of the remaining evidence against her. I would find the trial court's error in failing to grant Ward's motion for mistrial not harmless and would reverse and remand for a fair trial.

JOHNSON, J., joins in the foregoing dissent.