NOT DESIGNATED FOR PUBLICATION

No. 119,368

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of E.T.E.K.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed November 9, 2018. Affirmed.

*Raymond E. Probst Jr.*, of The Probst Law Firm P.A., of Kansas City, for appellant natural father.

*Ashley Hutton*, assistant district attorney, and *Mark A. Dupree Sr.,* district attorney, for appellee.

Before GARDNER, P.J., GREEN and SCHROEDER, JJ.

PER CURIAM: Father appeals the judgment of the trial court terminating his parental rights to E.T.E.K. On appeal, he argues that the evidence was insufficient to support the trial court's determination that he was unfit as a parent, that his unfitness was unlikely to change in the foreseeable future, and that it was in the best interests of the child to terminate his rights. We find these arguments unpersuasive. Accordingly, we affirm.

In April 2017, the Department of Children and Families (DCF) received a report that E.T.E.K., date of birth November 13, 2006, was reportedly afraid to live with her mother, T. D., due to allegations of physical and emotional abuse. Since E.T.E.K. was approximately three months old, she had lived with her maternal great aunt, Aunt Sue. Nevertheless, Mother took E.T.E.K. from Aunt Sue in approximately March 2017

1

because Mother believed Aunt Sue was speaking negatively about her to the child. E.T.E.K. was out of Aunt Sue's care for approximately one month in March 2017; Aunt Sue believed the child was with Mother during that time.

In April 2017, the State filed a petition to have E.T.E.K. adjudicated a child in need of care (CINC). Based on Mother's no contest stipulation, E.T.E.K. was adjudicated a CINC in May 2017. Later in September 2017, Mother's parental rights were terminated.

For the first several months of the proceedings, Mother claimed that S.K. was the natural father of E.T.E.K; however, she did not name a father on the child's birth certificate. The trial court appointed an attorney to represent S.K. However, S.K. did not appear at any of the court proceedings regarding E.T.E.K., nor did he attempt to complete any of the trial court's ordered requirements regarding the proceedings, such as visitation with E.T.E.K.

In the State's July 2017 motion to terminate Mother's parental rights, it listed S.K. as a putative father and also listed another putative father as "John Doe." The motion included that both putative fathers' parental rights should be terminated based on presumptions of unfitness. Moreover, the motion stated that the fathers' parental rights should be terminated on other statutory grounds that each was unfit by reason of conduct or condition that rendered them unable to properly care for the child and that their conduct or condition was unlikely to change in the foreseeable future. Publication of the notice of hearing on the State's motion to terminate John Doe's parental rights ran in *The Wyandotte Echo* on August 31, 2017, and September 7, 2017, with the date of the hearing stated as September 27, 2017.

At the September hearing, both S.K. and D.F. appeared. Although Mother's parental rights were terminated after that proceeding, the trial pertaining to the putative fathers was continued to January 8, 2018. The trial court ordered that both S.K. and D.F.

2

submit to paternity testing. Paternity test results, dated December 1, 2017, established the probability that D.F. was the father of E.T.E.K. at 99.99%. The trial court dismissed S.K. as a party in the case.

Father, D.F., testified at his January 2018 hearing that he was aware from "day one" that E.T.E.K. was his child; he believed and knew she was his. He stated that he was there "off and on" since E.T.E.K. was born, seeing her approximately four times, and that she lived in the same neighborhood. He stated that over most of the 11 years of the child's life, he'd spent a cumulative total of approximately 24 hours with her. His last physical contact with E.T.E.K. before seeing her at the September hearing was in March 2017 while she was staying with Mother. Mother told him to take E.T.E.K.; he did so, and then had her for approximately two weeks at that time.

Father did not pay child support because his name was not on E.T.E.K.'s birth certificate. He had never provided support to either Mother or Aunt Sue. He also never sent E.T.E.K. any birthday gifts or cards. Father explained that he never thought providing support would be beneficial to E.T.E.K. because Mother was not around. Nevertheless, he admitted he knew that Mother was not raising E.T.E.K. Father also acknowledged that he had not put any money aside for E.T.E.K., that he had never given her money, and that he did not have insurance coverage on her. He indicated that he recently spent $300 on clothing for her that was at his house.

Father testified that he always knew where E.T.E.K. lived. He grew tired of Mother's "game" of going back and forth regarding whether he was E.T.E.K.'s father, or whether S.K. was her father. Nevertheless, despite Aunt Sue's repeated conversations with him about getting a paternity test and her ultimate requirement that he do so before seeing E.T.E.K., Father testified he did not pursue testing. Father told Aunt Sue that Walmart carried paternity tests. She encouraged him to get one and resolve the issue, but he did not. He stated that he was upset that he was not allowed to see E.T.E.K. without

getting a paternity test. The trial judge asked Father why he did not get the paternity test, and Father replied, "I just didn't get it, sir."

Father had Aunt Sue's telephone number, which she had not changed in 30 years. Nevertheless, Father never contacted Aunt Sue to see E.T.E.K. Instead, he would reach out to Mother and then Mother would call Aunt Sue. When Father did speak with Aunt Sue, it was about paternity testing. He did not ever request to see E.T.E.K. in those direct conversations with Aunt Sue.

Father did not attempt to file a petition to have more time with E.T.E.K. or assert his parental rights because he never thought about it. He stated that he did not know the legal system. Father also stated that he did not contact a lawyer for assistance because he did not have any money. He testified that his wife consulted a lawyer, but he did not indicate when she did that.

In the two weeks that Father had E.T.E.K. in March 2017, she was not enrolled in school and he did not try to enroll her in school. Father knew the name of E.T.E.K.'s current school and her grade, but he did not know her teacher's name, nor did he know the last time she went to see a doctor. He explained he never asked because he was not allowed to see her without taking a paternity test.

Father testified that he tried to be a part of E.T.E.K.'s life since he got involved in the case approximately three months earlier. He completed his parental assessment, attended visitation appointments, and was scheduled to start parenting classes two days after the hearing. Father testified that he had a full-time job with benefits, and E.T.E.K. would have her own room in the house he shared with his wife. His wife was scheduled to attend parenting classes with him.

4

Father testified that he called Mother in April 2017 to see if he could have E.T.E.K. for Easter, and Mother told him the child was in the State's custody. While he knew E.T.E.K. was in custody, he stated he was not aware of a court date until September 2017. Father admitted he kept the information about E.T.E.K. being in custody from his wife for approximately five months, until late August 2017. Father testified that he had been with his wife since 2011, and she possessed a "license to adopt." Father believed she would know who to call because she was familiar with how the system worked. Father's wife called Amber Siefkas, the assigned permanency case manager for KVC, in September 2017 to get information about the hearing.

Siefkas testified that she first learned about D.F. in August 2017, and first met him at Mother's termination hearing in September. Siefkas called D.F. a few days before Mother's termination hearing in September 2017 and asked if he would attend; she told him as a putative father that it was in his best interest to attend. After the paternity test was ordered, Siefkas also wrote D.F. a letter inviting him to complete his initial assessment before receiving the paternity results to get a "jumpstart" on recommendations in the event the test determined he was E.T.E.K.'s father. D.F. did so, and completed the assessment a few days before the paternity results were available.

Once his paternity was confirmed in December 2017, Siefkas contacted Father to schedule visitation with E.T.E.K. In the time between confirmation of Father's paternity and the January 2018 hearing, Father and KVC scheduled five visits based on their respective schedules. The visitations were set for Mondays from 3:30 to 4:30 p.m. Father attended three of the five visitations, missing two because he worked late. Siefkas testified that E.T.E.K. was anxious, timid, and reserved during the visits. Siefkas prompted conversations, but there were periods of awkward silence. After such a silent period in one of the visits, Father requested they end early and he left the one-hour visit after approximately 45 minutes.

5

Siefkas testified that Father had begun to work on adhering to the trial court's orders. Father completed the assessment. He verified his income, but had not provided verification of his wife's income or submitted information for his background check. Father had not provided a copy of his lease. He had only attended three visits with E.T.E.K., and had not yet begun family therapy. Likewise, he was not scheduled to begin parenting classes until two days after the hearing. Siefkas indicated that not only were they basically starting a reintegration plan anew, but also they were starting a parenting relationship anew. Siefkas speculated that substantial progress could be made in the next 30-90 days. She also speculated that if the process went well, the time period for the relationship to evolve into one where reintegration was viable would be six months to a year. She acknowledged that the possibility of reintegration might never arise and stated that it was in E.T.E.K.'s best interests to stay with her Aunt Sue.

Father testified that it hurt him that E.T.E.K. did not know him. He further testified that he did not have a problem with E.T.E.K. living with her Aunt Sue; he just wanted to be able to see her.

The State, the guardian ad litem, and Aunt Sue's attorney argued that it was in E.T.E.K.'s best interests to terminate Father's parental rights. Father's attorney argued Father had been trying to establish a relationship with the child, but he needed more time. The trial court found that Father's recent actions to establish a relationship with E.T.E.K. were insufficient to overcome his absence and his failures for the past 11 years. Thus, the trial court concluded that Father was an unfit parent and that he was unlikely to change in the foreseeable future. The trial court further concluded that it was in the best interests of the child to terminate Father's parental rights.

*Does the Evidence, When Viewed in the Light Most Favorable to the State, Convince a Reasonable Fact-finder that It Was Highly Probable that Father's Parental Rights Should be Terminated?*

Father contends that the trial court improperly terminated his parental rights. He argues that there was insufficient evidence to support the trial court's determination that he was an unfit parent, that the conduct or condition rendering him unfit was unlikely to change in the foreseeable future, and that the termination of his parental rights was in the best interests of E.T.E.K. The State argues that the trial court's findings were proper and should be affirmed.

To support a CINC determination, the State must prove "by clear and convincing evidence that the child is a child in need of care." K.S.A. 2017 Supp. 38-2250. In addition, the clear and convincing evidence standard of proof also applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a). "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's right should be terminated. [Citation omitted.]." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011) (termination of parental rights). In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The court shall consider, but is not limited to, several factors listed in K.S.A. 2017 Supp. 38-2269(b) and (c). A finding of "any one of the . . . factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." K.S.A. 2017 Supp. 38-2269(f). Also, presumption of unfitness—as set out in K.S.A. 2017 Supp. 38-2271(a)—may apply if established by clear and convincing evidence. If the district court "makes a finding of unfitness, the court shall consider whether termination of

parental rights . . . is in the best interests of the child." K.S.A. 2017 Supp. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2017 Supp. 38-2269(g)(1).

The trial court concluded that there was clear and convincing evidence that Father was unfit to parent E.T.E.K. by reason of conduct or condition which rendered him unable to care properly for the child. Further, the court concluded that the conduct or condition was unlikely to change in the foreseeable future because Father had abandoned or neglected E.T.E.K. after having knowledge of her birth. Moreover, the court concluded that he failed or refused to assume the duties of a parent for two consecutive years next preceding the filing of the State's petition to terminate his parental rights. See K.S.A. 2017 Supp. 38-2271(a)(8), (a)(13). Considering the physical, mental and emotional needs of E.T.E.K., the trial court also concluded it was in the best interests of the child to terminate Father's parental rights. K.S.A. 2017 Supp. 38-2269(g)(1). The trial judge found that Father knew E.T.E.K. was his daughter, knew where she lived, and knew how to contact her. Moreover, the trial judge found that Father had numerous conversations with Aunt Sue about taking a paternity test so he could see E.T.E.K., but never took one even though he suspected that he was E.T.E.K.'s father. The trial court ruled that Father's recent conduct was not sufficient to overcome that he had not "been in this child's life in any meaningful way for the first 11 years."

Father argues that the evidence presented at his hearing was insufficient because he began to move forward complying with the trial court's orders before the establishment of his paternity by completing his initial assessment in late November 2017. He also points out that the evidence established he lived in a stable home and had a stable income. He began visitation as soon as he was allowed following the paternity test results. He was enrolled in parenting classes. He provided clothing for E.T.E.K. and spent two weeks with her in March 2017. Father argues that his progress in fulfilling the court's

orders demonstrates that the trial court "erred by finding he was unfit to parent and that his unfitness was unlikely to change in the foreseeable future."

Father fails to cite any case authority analogous to these sets of facts favorable to his position that the evidence was insufficient to support termination of his parental rights. By contrast, the State cites to *In re A.E.*, No. 117,585, 2017 WL 5616743 (Kan. App. 2017) (unpublished opinion), in which the father challenged the sufficiency of the evidence to terminate his parental rights. In *In re A.E.*, this court affirmed the termination of a father's parental rights after finding that among his manifold failures during the CINC proceedings, he missed 10 of 54 scheduled visits, which called into question his ability to adequately care for his children. 2017 WL 5616743, at * 6.

In this case, the record on appeal establishes—primarily through Father's own testimony—that he knew of E.T.E.K.'s birth and believed he was her father. He knew where E.T.E.K. lived, he knew that Mother was not raising her, he knew E.T.E.K.'s aunt was caring for her. He further knew how to contact Mother, and he knew how to contact Aunt Sue. In the first 11 years of E.T.E.K.'s life, Father saw her for a total of approximately 24 hours over a handful of visits. He knew that Aunt Sue wanted him to take a genetic test to resolve any questions about paternity before he could see E.T.E.K., and he knew where he could buy one. He could not provide a reason to the trial judge for not taking a paternity test earlier. He never provided any financial support for E.T.E.K., and the clothing he purchased for her was at his house. He did not have insurance coverage on her. He did not give her birthday gifts or cards. When E.T.E.K. was with him in March 2017, he knew she was not enrolled in school, and did not attempt to enroll her in school. He did not ask questions about her education or medical needs because he was not allowed to see her without taking the paternity test.

Father knew that E.T.E.K. was taken into the State's custody in April 2017. His wife was familiar with the system; yet, he withheld the information about E.T.E.K. being

in D.C.F.'s custody from her for approximately five months. Father chose not to become involved in the case until shortly before Mother's termination hearing in September 2017. Once Father was court ordered to submit to a paternity test, he did so which confirmed what he always knew and believed—that he was E.T.E.K.'s father. Even after this confirmation, Father missed two out of five scheduled visits, and he left early from one of the three visits he attended. In the approximate five weeks between his paternity confirmation and his January 2018 termination hearing, Father did not provide a copy of his lease or complete information regarding his background check or his wife's employment and income.

Father's argument at the January hearing was that he needed more time to establish a relationship with E.T.E.K. This is also the crux of his argument on appeal: There was insufficient evidence to terminate his parental rights because he was making efforts to establish a relationship with E.T.E.K. and he needed more time to establish that relationship. Father essentially argues for an alternate interpretation of the record and a reweighing of the evidence, which this court cannot do. *In re B.D.-Y.*, 286 Kan. at 705. Viewed in the light more favorable to the State, there was sufficient evidence in the record to support the trial court's conclusions that Father was unfit to parent and that was unlikely to change in the foreseeable future.

Father also argues the trial court erred in terminating his parental rights after finding that termination was in the best interests of E.T.E.K. Nevertheless, the trial court is in the best position to make findings of fact regarding the best interests of the child, and its judgment will not be disturbed in the absence of an abuse of discretion. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010).

This court reviews a trial court's decision regarding the best interests of the child for abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014). Judicial discretion is abused if the judicial decision (1) is arbitrary, fanciful, or

10

unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011). Father does not claim that the trial court abused its discretion in finding that termination of his parental rights was in the best interests of E.T.E.K.

Instead, Father argues that because Siefkas acknowledged that progress in establishing a relationship between Father and E.T.E.K. could be made if allowed additional time, the evidence was insufficient to terminate "the relationship between father and child." Father claims, "If there is as much of a chance that progress could be made toward keeping the parent/child relationship in tact [*sic*] then it is not in the best interest of the child to terminate parental rights." Father cites no legal authority to support his argument. Issues not adequately briefed are deemed waived or abandoned. *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018). A point raised incidentally in a brief and not argued therein is also deemed abandoned. *Russell v. May*, 306 Kan. 1058, 1089, 400 P.3d 647 (2017).

Father fails to acknowledge that his late involvement with the case was his choice, as was his lack of involvement in E.T.E.K.'s life for the first 11 years. Father also fails to acknowledge that Siefkas also stated that his nascent relationship with E.T.E.K. could take several months or more, even if everything went well, to get to the stage where reintegration was viable. The trial judge acknowledged the concept of "child time" when he denied Father's request for a continuance, observing that E.T.E.K. had been in the State's custody for nearly a year, and it was not in her best interests to continue the proceeding, especially in light of Father's failure to contact his attorney between the September 2017 and January 2018 hearings. See *In re D.T.*, 30 Kan. App. 2d 1172, Syl. ¶ 4, 56 P.3d 840 (2002) ("Courts must strive to decide termination cases in 'child time,' rather than 'adult time.'"). Father does not explain how prolonging E.T.E.K.'s case and lack of permanency is in her best interests.

11

Father does not allege that the trial court made an error of law or fact. The trial court was not required to allow Father additional time to try and establish a relationship with E.T.E.K. In light of the record as a whole, the trial court's conclusion that termination of Father's parental rights was in the best interests of E.T.E.K. was not unreasonable, fanciful, or arbitrary. Thus, the trial court properly terminated Father's parental rights.

Affirmed.