NOT DESIGNATED FOR PUBLICATION

Nos. 122,009
122,010
122,011
122,012
122,013
122,014

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of I.G., A.G., M.D., A.D., Li.D., and Lu.D.,
Minor Children.

MEMORANDUM OPINION

Appeal from Clay District Court; JOHN F. BOSCH, judge. Opinion filed May 8, 2020. Affirmed.

*Andy Vinduska*, of Manhattan, for appellant natural mother.

*Coleman J. Younger*, of Galloway, Wiegers & Brinegar, P.A., of Marysville, for appellee State of
Kansas.

Before STANDRIDGE, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM:  Mother appeals the district court's decision to terminate the parental
rights to her six children, I.G., A.G., M.D., A.D., Li.D., and Lu.D. Specifically, Mother
challenges the district court's findings that she is unfit and that it is in the best interests of
the children to terminate her parental rights. For the reasons stated below, we affirm.

FACTS

On April 20, 2017, I.G., A.G., M.D., A.D., Li.D., and Lu.D. were taken into police
protective custody after A.D. fell out of a moving vehicle that Mother was driving while

1

under the influence of a narcotic. Four days later, the State filed a child in need of care petition on behalf of all six children, and the district court ordered the children remain in the temporary custody of the Kansas Department for Children and Families (DCF). Two months later, Mother submitted a statement of no contest at the adjudication hearing, and the children were found to be in need of care. The district court ordered the children to remain in DCF custody and adopted a case plan that was developed a month prior.

Several permanency hearings were held during the first year after the children were taken into custody. At the conclusion of each of these hearings, the district court determined that reintegration remained a viable option.

On August 8, 2018, the district court allowed I.G. and Lu.D. to move back into Mother's home and the remaining children to have overnight visits. After two overnight weekend visits with Mother, however, the St. Francis Community Services (SFCS) case manager assigned to the case reported that M.D.—who was an insulin dependent diabetic—had blood sugar levels that posed "an immediate danger to [M.D.'s] health" after returning from weekend visits with Mother. The State filed a motion to modify parental visitation. The district court granted the motion to the extent that it gave SFCS sole discretion on the issue of visitation between Mother and the four minor children participating in overnight visits. The court did not modify its previous decision allowing I.G. and Lu.D. to move back into Mother's home.

I.G. and Lu.D. remained in Mother's home until the State filed a motion to remove the children on December 14, 2018. The State filed the motion based on multiple allegations, including a report that the children had witnessed a physical altercation between Mother and B.D. (the father of M.D., A.D., Li.D., and Lu.D.) and a report that M.D. called 911 the next day due to an argument between Mother and her current boyfriend. The district court granted the motion and ordered the State to remove I.G. and Lu.D. from Mother's home and return them to foster placement.

At a permanency hearing on March 5, 2019, the district court determined reintegration was no longer a viable goal and ordered the State to file a motion for termination within 30 days. The State filed the motion a month later and the two-day termination hearing began on July 23, 2019. At the end of the hearing, the district court found clear and convincing evidence that Mother was unfit, that the conduct or condition rendering her unfit was unlikely to change in the foreseeable future, and that termination of Mother's parental rights was in the best interests of the children.

ANALYSIS

On appeal, Mother claims there is insufficient evidence to support the district court's findings (1) that she is unfit and (2) that termination of her parental rights is in the best interests of her children.

1. *Unfitness*

The standard of review for a finding of parental unfitness requires us to determine, after reviewing all of the evidence in a light most favorable to the State, whether a rational fact-finder could have found the determination to be highly probable, i.e., by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008); *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). In making this determination, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. at 705.

The standard of proof for a finding of parental unfitness in termination proceedings requires the State to prove a parent is unfit "by reason of conduct or condition which renders the parent unable to care properly for a child." K.S.A. 2019 Supp. 38-2269(a). The statute contains a nonexclusive list of nine factors that singularly or in combination may constitute unfitness. K.S.A. 2019 Supp. 38-2269(b), (f). The

3

statute lists four other factors to be considered when, as here, the parent no longer has physical custody of a child. K.S.A. 2019 Supp. 38-2269(c).

Having set forth the applicable standard of review and standard of proof, we turn to the district court's decision below. After the close of evidence at trial, the district court relied on seven statutory factors to support its finding of unfitness. But in its journal entry, the court set forth only the following three statutory factors to support its finding that Mother was unfit:

- failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family (K.S.A. 2019 Supp. 38-2269[b][7]);

- lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child (K.S.A. 2019 Supp. 38-2269[b][8]); and

- whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in K.S.A. 2019 Supp. 38-2269(c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home (K.S.A. 2019 Supp. 38-2269[b][9]).

"In a civil action, a district court's journal entry of judgment controls over a prior oral pronouncement from the bench." *Steed v. McPherson Area Solid Waste Utility*, 43 Kan. App. 2d 75, 87, 221 P.3d 1157 (2010). So our sufficiency of the evidence analysis is limited to reviewing only the statutory factors for unfitness relied on by the district court as set forth in its written journal entry of judgment. But in its journal entry, the court did not find any of the factors listed in K.S.A. 2019 Supp. 38-2269(c) applied in this case.

4

Therefore, we only will consider whether there is clear and convincing evidence in the record to support the district court's legal conclusion that Mother was unfit under K.S.A. 2019 Supp. 38-2269(b)(7) and K.S.A. 2019 Supp. 38-2269(b)(8).

Under K.S.A. 2019 Supp. 38-2269(b)(7), a district court may find a parent unfit if there is clear and convincing evidence that reasonable efforts have been made by public or private agencies to rehabilitate the family but those efforts have failed. This subsection of the statute imposes an obligation upon the relevant social service agencies to expend reasonable efforts toward reintegrating children with their parents. See K.S.A. 2019 Supp. 38-2201(b)(8) (one of the goals of the revised Kansas Code for Care of Children, K.S.A. 2019 Supp. 38-2201 et seq., is to provide "preventative and rehabilitative services, when appropriate, to abused and neglected children and their families so, if possible, the families can remain together without further threat to the children"). Under K.S.A. 2019 Supp. 38-2269(b)(8), a district court may find a parent unfit if there is clear and convincing evidence that the parent has failed to adjust his or her circumstances, conduct, or conditions to meet the needs of the children. For the reasons stated below, we find clear and convincing in the record to support the district court's finding that SFCS's reasonable efforts to rehabilitate the family failed and that Mother failed to adjust her circumstances to meet the needs of her children. We review the evidence of each case plan task assigned to Mother by the court and SFCS because it is in this context that it is the easiest to see the tremendous effort exerted by SFCS in this case to help Mother and the lack of effort exerted by Mother to adjust to her circumstances to achieve reunification.

5

a. *Case task plans*

(1) *Complete drug and alcohol assessment and follow all recommendations*

As part of her May 12, 2017 initial case plan to achieve reunification, Mother was required to complete a drug and alcohol assessment and follow all recommendations. The SFCS case manager provided Mother with the phone number for a Regional Alcohol and Drug Assessment Center (RADAC) multiple times throughout the case. Mother's husband completed his drug and alcohol assessment on May 31, 2017, less than three weeks after the case plan task was assigned. But Mother did not complete her assessment until March 10, 2018, over 10 months after the task was assigned. And, although the addiction therapist concluded that Mother did not meet the criteria for an official diagnosis of a substance related disorder as specifically defined in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, the addiction therapist highlighted in bold-face type in the assessment that her conclusion in this regard was based solely on Mother's "self-reported" information. At the end of the assessment, the addiction therapist recommended that Mother consult with a mental health provider who could teach her how to engage in stress management techniques instead of using marijuana to self-medicate. As discussed in more detail below, Mother did not engage in individual counseling as recommended until November 13, 2018, over 8 months after the addiction therapist made this recommendation in the RADAC assessment and 18 months after the court ordered the drug and alcohol assessment. As also discussed in more detail below, the evidence presented at trial reflects that Mother continued to use marijuana while this case was pending.

(2) *Complete mental health evaluation and follow all recommendations*

Mother also was required as part of her May 12, 2017 initial case plan to complete a mental health evaluation and follow all recommendations. Mother originally was scheduled to complete her mental health evaluation at Pawnee Mental Health in

6

Manhattan, but she missed her appointment multiple times and Manhattan Pawnee eventually declined to schedule any more appointments for Mother. The SFCS case manager offered to call Manhattan Pawnee to see if it would give her another chance, but Mother told the case manager, "'[D]on't even try—I told them to eat a bag of dicks.'"

Since Mother's behavior excluded Manhattan Pawnee as an option, the SFCS case manager researched other options and eventually was able to set up a mental health and parenting evaluation for Mother with Dr. Fajen at Andrews and Associates. The assessment required three sessions. Mother attended the first session of the mental health assessment on February 1, 2018, over eight months after the court ordered her to complete it. Mother missed the next session and did not schedule her final session until May 23, 2018, a full year after the court ordered her to complete it. In his written assessment, Dr. Fajen recommended Mother engage in both individual therapy and family therapy. The SFCS case manager scheduled appointments for Mother to receive individual therapy services through Pawnee Mental Health in Clay Center. Mother later advised the SFCS case manager, however, that she did not attend any of her scheduled counseling sessions. Clay Center Pawnee eventually declined to schedule any more appointments for Mother. The SFCS case manager was unable to confirm these reports because Mother refused to sign a release for SFCS to obtain that information.

It was not until November 13, 2018—five months after Dr. Fajen recommended she engage in individual counseling and 18 months after the court ordered her to complete a mental health assessment and follow the recommendations—that Mother finally attended her first individual counseling session. But Mother did not make a follow-up appointment with the individual therapist until the SFCS case manager reached out and encouraged her to do so.

(3) *Maintain safe and stable housing*

Although the May 12, 2017 initial case plan to achieve reunification required Mother to maintain safe and stable housing, Mother failed to obtain the necessary housing until on or around July 17, 2018, which was 14 months after the court ordered her to achieve this goal. And at the time of trial, there were still issues with safe housing. In a report prepared the week before trial, the SFCS case manager related as follows:

"The most recent safety concern [SFCS] experienced was at the visit on May 20th, 2019. During this visit[], [the infant] was in the living room playing on the floor by himself. Worker picked him up to bring him to the other room where all the other children and [Mother] were. After picking him up worker saw there was something in his mouth and pulled out a tack. This is not the first time workers have had to pull objects out of [the infant's or Lu.D.'s] mouth. [Mother] is currently living with her boyfriend John who helps out with the children but is commonly in jail. His last sanction was for five days in early July. Currently, [Mother] is allowing workers to come into her home. Many times throughout the case, [Mother] has refused workers access into her home."

(4) *Provide urinalysis samples for drug testing when requested*

The initial case plan developed on May 12, 2017, required Mother to provide urinalysis (UA) samples for drug testing when requested by the SFCS case team. On October 23, 2017, Mother had an unsupervised visit in the home with all six of her children. At pick up, Mother asked the foster parents to buy A.G. (approximately age 11) and M.D. (approximately age 8) dinner, meaning that she had failed to provide them dinner during the visit as required. Several of the foster parents who had dropped off and picked up the kids for this visit reported to the case team that Mother was not able to focus and appeared to be under the influence of something. Meanwhile, one of the children's Court Appointed Special Advocate (CASA) workers happened to be on a walk in Clay Center during the visit and walked by the front of Mother's house. The CASA worker reported that she observed Lu.D. (an infant) eating grass and the twins (toddlers)

running around the front yard. All of the foster placements and the CASA worker were very concerned about the well-being of the children after this visit. The case team spoke with Mother regarding these concerns and explained that the visits would be changed to two-hour monitored weekly visitation contingent on a UA sample for drug testing that came up clean prior to the visit. In a report to the court dated November 22, 2017, the SFCS case manager recommended that the court issue an order specifically requiring visitation be contingent upon a clean UA drug test. The court issued that order on March 21, 2018.

In addition to admitting she used drugs and her positive drug tests, Mother consistently refused or was uncooperative in providing UA samples. In order to have visitations with her children, the court required Mother to first provide a clean UA before every visitation. Of the 181 visitation opportunities Mother was offered over the entirety of this case, she attended approximately 62 percent of the visits. The "main reason" Mother missed the approximately 38 percent of visits available was her failure or refusal to provide a UA sample. Mother conceded that she had "not always submitted to testing" and admitted that when SFCS moved her to supervised visitation contingent on a clean UA, she "rebelled" and simply decided she "wouldn't do it."

The record also reflects concerns that Mother was using other people's urine to submit for testing or otherwise was tampering with the samples submitted. In the summer of 2018, SFCS received screenshots of messages that showed Mother asking friends to provide her with clean, drug-free urine. In fact, A.G. (approximately 12 years old at the time) reported that Mother asked her to urinate in a cup during a visit so she would have clean urine for the UA sample. In September 2018, a hospital social worker reported to DCF that Mother "ran into the hospital with no shoes on, carrying something in her pocket that she then warmed up in a microwave." After SFCS reviewed video footage of the incident, the case manager informed Mother that, going forward, an approved witness must be present to observe Mother during the process of her providing the urine sample.

Mother was very upset about this new procedure and told the case manager to "'go fuck herself.'" SFCS workers tried to be empathetic by setting up other options such as mouth swab or hair follicle tests, but Mother refused. In fact, Mother told the SFCS case manager that "'the only way I will do a hair follicle test for you is if Judge Bosch orders it. Then I will bend over in court and he can take one of the hairs from my asshole if he wants.'" At one point, Mother went a whole month without seeing her children just because she refused to provide a UA sample.

In April 2019, jail staff—who witnessed Mother providing her UA sample—called the SFCS case manager with concerns that Mother was faking or tampering with her urine sample for testing. Jail staff reported that when Mother first came in, she struggled to urinate for about an hour and that when she did go, she only urinated a little, even after drinking the whole time she was waiting. Jail staff also reported that when she did urinate, she pushed really hard "'as if she [was] trying to pop a balloon,'" which was a method the staff had seen other clients engage in when attempting to tamper with UA samples. Jail staff reported that these concerning activities occurred every time Mother came in.

During the 27 months this case was pending, Mother struggled to comply with the district court's order to submit clean UA samples for drug testing. In addition to her admitted use of Percocet, Mother admitted to using marijuana while this case was pending. In November 2018, Mother had a hair follicle test positive for methamphetamine. In March 2019, Mother's UA sample tested positive for amphetamines. SFCS requested Mother complete an additional hair follicle test in June 2019 in anticipation of the upcoming termination hearing, but Mother refused to submit to the test.

### (5) *Sign all necessary releases*

Mother also was required as part of the May 12, 2017 initial case plan to sign all necessary releases to allow SFCS to access the information necessary to guide the district court in deciding whether Mother was completing case plan tasks and making the progress necessary to achieve reunification with her children. Mother did sign some releases for SFCS but repeatedly refused SFCS requests to sign others. For example, Mother refused to sign a release for Clay Center Pawnee and Parents as Teachers of Clay Center.

### (6) *Complete a diabetes parent education course*

On September 7, 2017, the CASA supervisor wrote a memorandum to the district court regarding the status of the children for the upcoming disposition hearing. In the recommendation section, the CASA supervisor suggested the court order Mother to complete diabetes parent classes to learn the necessary skills to properly care for M.D.'s diabetic health condition. As the basis for this recommendation, the CASA supervisor stated that "[a]ccording to school personnel, [M.D.]'s diabetes has only been controlled since she has been in her foster care placement. Parents were not receptive to parent classes in the past and [M.D.] was hospitalized due to lack of attention to her medical care." The court ultimately adopted the recommendation of the CASA supervisor and issued an order on September 11, 2017, requiring Mother to complete an online 16-hour class for parents of children with diabetes.

At a review hearing held on November 29, 2017, the district court apparently became aware that Mother had not complied with its order to complete the class for parents of children with diabetes. Accordingly, the court ordered Mother to complete the diabetes class by February 15, 2018, and provide proof of completion to the court. Mother completed the class in January 2018—four months after it was ordered—but even

so, she struggled to manage and care for M.D.'s diabetes during visits after the class was over. Mother commonly forgot to dose M.D.'s insulin correctly and would forget to give her insulin before she ate. In the summer of 2018, SFCS caseworkers made log sheets for Mother to complete during lengthy visits to better keep track of the dosing times and amounts. The SFCS caseworkers never received a log sheet back from Mother. With visits supervised, Mother was in charge of dosing M.D. for only one meal a week but still occasionally forgot and had to be reminded by the supervising worker.

### (7) *Complete a parenting class*

On November 22, 2017, the SFCS case manager drafted a report to the district court regarding the upcoming case review hearing. After setting forth the status of the children's mental health and current placements, the SFCS case manager provided a detailed review of recent health and safety concerns with visits between Mother and the children. In the recommendation section, the SFCS case manager suggested the court order Mother to complete a parenting class so she could acquire the skills necessary to make sure her children were healthy and safe during visits. The court ultimately adopted this recommendation and issued an order on November 29, 2017, requiring Mother to complete parenting classes by February 15, 2018, and provide proof of completion to the court.

SFCS provided Mother with the contact information for Clay Center Pawnee's parenting class, which did not start until March 2018. In the meantime, SFCS case workers initiated contact with Parents as Teachers in Clay Center and provided the organization with Mother's contact information. Parents as Teachers called Mother and set up regular weekly appointments. Given the children's schedules, however, SFCS had to change the day of the week for the meetings. Mother became angry about the change and ultimately severed the relationship with Parents as Teachers altogether, saying that

she did not need their help because she had done a fine job raising seven children by herself.

When March rolled around, Mother was hesitant to attend the parenting class because she did not think she could successfully attend all six-week sessions. The SFCS case team encouraged her to try her hardest to make the ones she could. Mother missed the first two and did not try to make any more after that. In June 2018, the SFCS case manager told Mother she would try and set up Parents as Teachers services again if Mother was interested. Mother agreed, and the worker called to set up meetings with Mother and Parents as Teachers. Later that month, Mother, who was pregnant, told the SFCS case manager that the doctors believed she could go into labor at any time and that she would prefer to wait until after the baby was born. After the baby was born, Parents as Teachers struggled to reach Mother (her phone was disconnected for several weeks), but it was finally able to set up services beginning August 6, which was a date when Mother was scheduled to have a visit with the children. On August 6, however, Mother called and said she had to cancel because she was sick. Parents as Teachers rescheduled for August 16, but Mother cancelled. Parents as Teachers rescheduled again for August 23, but Mother cancelled. On August 28, the Parents as Teachers worker showed up to Mother's home for a scheduled appointment, but no one was home. Parents as Teachers finally reached out to the SFCS case team and explained that Mother needed to make sincere efforts if she intended to enroll. In the wake of this conversation, the SFCS case manager explained to Mother the importance of taking a parenting class because the court had ordered her to do it. Mother took no action.

In November 2018, the SFCS case manager reminded Mother that the parenting class was a task ordered by the district court that she had not completed as required. Mother took no action. In December 2018, the SFCS case manager reached out to the Evangelical Covenant Church in Clay Center to set Mother up with a group called "'Connecting Moms.'" This is a mentor program that connects mothers in the community.

Mother agreed to try it and reached out to the church during one of her therapy sessions. There is nothing in the record to suggest that Mother ever contacted anyone in the program again.

After the court hearing in January 2019, Mother agreed she would try Parents as Teachers for a third time. At the initial meeting, Mother told Parents as Teachers that she did not want them sharing any information with SFCS. And, as set forth above, Mother refused to sign a consent form for Parents as Teachers to release any information about Mother to SFCS or DCF. Without that consent, SFCS could not access the information necessary to guide the court in deciding whether Mother was developing the parenting skills necessary to achieve reunification with her children. In fact, the only information the SFCS case manager learned was that Mother missed the majority of the Parent as Teacher appointments scheduled from January 2019 through April 2019 and that the last time Parents as Teachers met with Mother was April 9, 2019. Notwithstanding the tremendous effort put forth by the SFCS case team, Mother failed to successfully complete parenting classes during the 20-month period from the court's order to do so on November 22, 2017, through July 23, 2019, the date of Mother's trial.

(8) *Complete family therapy with A.G.*

At a hearing in August 2018, the district court ordered Mother and A.G. to engage in family therapy because A.G. refused to attend visits with her Mother. The court, the SFCS case team, and the parties agreed, however, that this family therapy should not begin until Mother started and began making progress in individual therapy. As set forth above, Mother did not have her first appointment for individual therapy until November 13, 2018, and did not start making any progress until about three months in. So at the end of February 2019, the SFCS case manager scheduled a family therapy appointment for Mother and A.G. with Clay Pawnee therapist Erin Mellie. But Mother told the SFCS case manager that she did not want to use Clay Pawnee; she wanted a

therapist with whom she could start with a clean slate. The SFCS case manager attempted to find a therapist in the SFCS network who was willing to travel to Clay Center but could not find one. Apparently recognizing the effort made by the SFCS case manager, Mother reported in late March 2019 that she would reach back out to Clay Center Pawnee and retry to set up therapy. This never happened. Notwithstanding the tremendous effort put forth by the SFCS case team, Mother failed to engage in family therapy during the 11-month period from the court's order to do so in August 2018 through July 23, 2019, the date of Mother's trial.

> b. *Mother's lack of progress on her case task plans and the agency's reasonable efforts to help Mother achieve complete those tasks to achieve reintegration*

As the discussion above establishes, SFCS not only met, but exceeded, its obligation to expend reasonable efforts toward reintegrating the children with their Mother in this case, but those efforts failed. Over the 27-month span of this case, SFCS workers had frequent, almost daily, contact with Mother. During this extended time period, SFCS workers repeatedly tried to persuade and motivate Mother to comply with case task plans including the required drug and alcohol assessment and recommendations, mental health evaluation and recommendations, individual behavioral therapy, family therapy, drug testing for visitations, parenting classes, signing releases, and diabetic classes. Significantly, the SFCS workers continued to provide services to Mother without interruption even though Mother conceded she purposefully attempted to damage her relationship with SFCS by being intentionally "abrasive and callous" to the worker, and refused to submit to UA testing because she "rebelled."

At trial, the district court specifically found that Mother made inappropriate comments and was verbally abusive to social workers and individuals involved during visits. This finding is also supported by the record. In February 2019, Mother became verbally aggressive with her SFCS case manager in front of the children during a visit.

15

The case manager asked Mother not to talk about the case in front of the children during visits because it was stressful for the kids and caused two of the children to cry. Mother told A.D. "it was okay to cry because [SFCS] wanting to terminate her rights was a real thing" and "told all the children to ask worker about wanting to terminate her rights as a parent." A.G. attempted to calm Mother down, and M.D. apologized to the SFCS case manager for Mother's behavior. Ultimately, Mother told SFCS that she was not going to stop talking about the case in front of the children, and SFCS began requiring visits to be supervised.

After hearing this evidence at trial, the district court found that Mother had "basically admitted she's sabotaged these attempts [by SFCS to reintegrate]." The district court went on to state that SFCS made reasonable attempts to rehabilitate the family, but Mother "was rebellious, she was not compliant, and only until this Court ordered that this matter proceed to termination did she finally decide she was gonna work with them." We find clear and convincing evidence in the record to support the district court's conclusion that Mother is unfit under K.S.A. 2019 Supp. 38-2269(b)(7), which provides for termination if the appropriate agency expended reasonable efforts toward reintegrating the children with their parent but those efforts failed.

> c. *Mother's lack of progress on her case task plans and the lack of a demonstrated ability to adjust her circumstances to meet the needs of her children*

The State presented clear and convincing evidence at trial that Mother failed to adjust her circumstances to meet the needs of her children during the 27 months that this case was pending. Specifically, Mother failed to accomplish her assigned case task plans including the required drug and alcohol assessment and recommendations, mental health evaluation and recommendations, individual behavioral therapy, family therapy, drug testing for visitations, parenting classes, signing releases, and diabetic classes. And for those case task plans that Mother did complete, the case task plan discussion above

16

reflects that she failed to do so in a timely manner. We find clear and convincing evidence in the record to support the district court's conclusion that Mother is unfit under K.S.A. 2019 Supp. 38-2269(b)(8), which provides for termination based on a lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child.

2. *Best interests of the children*

Mother does not contest the district court's determination of whether her conduct or condition is unlikely to change in the future, but Mother does argue that the district court erred when it found termination of her parental rights was in the best interests of the children.

Having found unfitness, the district court must then decide whether termination of parental rights is "in the best interests of the child [giving] primary consideration to the physical, mental and emotional health of the child." K.S.A. 2019 Supp. 38-2269(g)(1). The district court makes that decision based on a preponderance of the evidence. This decision is within the sound discretion of the district court, and an appellate court reviews this decision for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representation, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

Mother improperly states the standard of review for this determination as a clear and convincing evidence standard but appears to argue that the district court ignored controlling facts because it "completely failed to take into consideration that the reason

for Mother's rebellion was due to her own childhood and adult trauma." But Mother does not support this argument with any authority as to why Mother's childhood and adult trauma should excuse her rebellion.

Having found no shortcomings in the district court's assessment of the evidence or applicable legal principles, the question becomes whether no reasonable district court would come to the same conclusion. Here, the record shows that the children have been in DCF custody for 27 months. Lu.D. was only three months old, and A.D. and Li.D. were two years old, when they were removed from Mother's care. By the time of trial, the youngest children had spent the majority of their lives in foster placements.

Additionally, the record shows that M.D.'s health has improved since being out of Mother's home. Multiple witnesses testified to being concerned about Mother's ability to manage M.D.'s diabetes. Before M.D. was removed from Mother's home, M.D. did not attend her doctor's appointments, lacked the necessary supplies at school, and would come to school with dangerous blood sugar levels. M.D.'s school nurse testified that M.D.'s blood sugar has been "better maintained over an extended period of time" while in foster care. This had allowed M.D. to focus on school and not have to worry about when she was going to eat and have troubles at home.

I.G. was also more successful after he left Mother's house. Either intentionally or through neglect, Mother thrust upon I.G., as the eldest child, parent-like responsibilities for helping his youngest siblings that kept him from school and his studies. While living with Mother, I.G. missed 133 class periods and had a GPA of 0.713. But, after returning to his foster placement, I.G.'s GPA rose to 2.87, and he had no unexcused absences.

This evidence supports the district court's conclusion, and other courts could come to the same conclusion. As such, the district court did not abuse its discretion when it

18

determined termination of Mother's parental rights was in the best interests of the children.

Affirmed.